**Richard GRAFF, Plaintiff–Appellant,**

v.

**CITY OF CHICAGO, an Illinois corporation, Defendant– Appellee.**

No. 92–2352.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1993.

Decided Nov. 24, 1993.

Matthew J. Piers, Jonathan A. Rothstein (argued), Jennifer L. Fischer, Gessler, Flynn, Fleischmann, Hughes & Socol, Chicago, IL, for Richard Graff.

Eileen T. Pahl, Office of the Corp. Counsel, Chicago, IL, Ruth M. Moscovitch, Asst.

Corp. Counsel, Bobbie McGee Gregg, Asst. U.S. Atty., Kelly R. Welsh, Asst. Corp. Counsel, Benna R. Solomon, Office of the Corp. Counsel, Appeals Div., Lawrence Rosenthal, Deputy County Counsel (argued), Deputy Corp. Counsel City of Chicago, Chicago, IL, for City of Chicago.

Jeffrey T. Kraus, William S. Ettelson, Altheimer & Gray, Chicago, IL, for amicus curiae Chicago Cent. Area Committee, Burnham Park Planning Bd., Cent. Michigan Avenue Business Assoc. and LaSalle Street Council, Inc.

Lawrence R. Levin, Damon E. Dunn, Levin & Funkhouser, Chicago, IL, for amicus curiae Chicago Sun-Times, Inc., Gannett Satellite Information Network, Inc. and Chicago Tribune Co.

Before POSNER, Chief Judge, and CUMMINGS, BAUER, CUDAHY, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

MANION, Circuit Judge.

For nearly seventy years a newsstand has stood in front of the City of Chicago Cultural Center (formerly the Chicago Public Library). The plaintiff, Richard Graff, has operated his newsstand there since July 1984, when he purchased the stand for over fifty thousand dollars. This case concerns a City of Chicago municipal ordinance designed to force newsstand operators, such as Graff, to either acquire a permit or face eviction. Chicago threatened to remove Graff from his location. Rather than request a permit, Graff ultimately sought relief in the federal district court, with a facial challenge to the ordinance. The district court denied Graff's request to enjoin Chicago's proposed enforcement of the ordinance. 800 F.Supp. 576. For the following reasons, we affirm.

## I. Background

From all indications Graff's predecessors had no ownership or property rights to the newsstand. Such newsstands seemed to have operated on public property by sheer acquiescence. At the time Graff purchased the newsstand, Chicago ostensibly required newsstand operators to acquire permits. We say ostensibly, because Graff asserted that then and now newsstands have operated on the public way without permits and only Graff has been targeted for eviction.

Under what we shall call the old ordinance, these permits were issued at the discretion of the commissioner of streets and sanitation, and the mayor could revoke a permit at any time. The old ordinance provided that such newsstands could only sell Chicago papers, and provided the mayor with no standards to guide his discretion. It also lacked hearing procedures to review the decisions to deny or revoke a permit. Chicago Mun.Code §§ 10-28-130 to -190. Graff attempted to apply for a permit under the old ordinance without much success, although Chicago continued to issue permits for newsstands at other locations.

In November 1990, Chicago gave Graff two months' notice to remove his newsstand from the public way. This order was later rescinded. Graff, however, had had enough. On February 20, 1991, he filed a complaint against Chicago and Mayor Daley alleging that the old ordinance violated the Commerce Clause and the First and Fourteenth Amendments to the United States Constitution.[1] He sought injunctive relief, compensatory damages and attorneys fees. Rather than defend the old ordinance, on June 28, 1991, Chicago amended it. Chicago Mun. Code §§ 10-28-130 to -192 (1991). The defendants thereafter moved to dismiss the complaint arguing the new ordinance corrected the constitutional deficiencies that Graff had identified in his complaint. The court dismissed the case without prejudice. Rather than apply for a permit under the new ordinance, on September 11, 1991, Graff amended his complaint and attacked the new ordinance on its face. The complaint sought comprehensive relief: declaratory, preliminary and permanent injunctions, compensato-

---

1. Mayor Daley was sued only in his official capacity. Graff does not appeal the district court's dismissing Mayor Daley from the case. *See Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (official capacity suits are essentially against the municipality).

ry damages and attorneys fees under the First and Fourteenth Amendments.

Broadly speaking, in count one Graff alleges that Chicago's permit ordinance constitutes an unlawful prior restraint of free speech. In count two he alleges that the new ordinance violates the Equal Protection Clause because other, non-expressive uses of the public way (such as sidewalk cafes) are treated more favorably than newsstands. In count three he alleges that the old ordinance denied him equal protection of law under the Fourteenth Amendment. In 1987 Graff moved his newsstand from the east side of the Cultural Center to the west side entrance off of Randolph Street to accommodate construction of the underground Pedway Tunnel. Under count three he seeks to recoup the expenses of having had to move his newsstand and certain architectural expenses he incurred when filing his application for a permit under the old ordinance.

Again, Chicago moved to dismiss. Before the court ruled on the motion, on May 14, 1992, Chicago again notified Graff that it intended to remove his newsstand in fifteen days. Chicago had consistently objected to the size of the newsstand and had requested that it be built out of steel rather than wood. Graff filed an "Emergency Motion for Temporary Restraining Order and for Preliminary Injunction." The motion had the effect of quickly forcing the court's hand. On May 28, 1992, the court dismissed counts one and two and denied injunctive relief entirely.

The court initially found that the complaint could be read to raise an as-applied and a facial challenge to the new ordinance. But because Graff had not applied for a permit under the new ordinance, the court concluded that only a facial challenge was before it. As to count one, the court concluded that the new ordinance was content-neutral and did not raise the threat of self-censorship as enunciated in *City of Lakewood v. Plain Dealer*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). The court also concluded that the new ordinance contained reasonable time, place and manner restrictions necessary to accommodate the multiple uses of the public way, and contained adequate procedural safeguards. As to count two, the

court ruled that Chicago could establish size limitations for newsstands, even though it did not do the same for sidewalk cafes. The court ruled that the municipal code did not support Graff's allegation that the landmark commission treated newsstands differently than other structures that visibly affected landmark property. Because Graff could not show a substantial likelihood of success on the merits, the district court denied Graff's motions for injunctive relief. Count three dealing with the old ordinance remains alive in the district court.

While Graff appealed the dismissal of counts one and two, he applied for a permit to operate two newsstands in front of the Cultural Center. Because of the location, Graff had to first seek permission from the Commission on Chicago Historical and Architectural Landmarks. That application was denied on August 13, 1992, because the newsstands would compromise the architectural integrity of the adjoining landmark building. On August 14, 1992, Chicago again notified Graff that he had fifteen days to remove his newsstand. Graff sought an injunction in this court, which we promptly dismissed. We directed him to file the matter in the district court pursuant to Fed.R.App.P. 8(a). After the district court denied him relief, on September 16, 1992, we granted Graff's motion and enjoined Chicago from destroying the newsstand pending appeal.

On February 8, 1993, after oral argument but before decision, Chicago moved to dissolve the injunction because of planned rehabilitation of the Cultural Center. Chicago had hoped to replace the handicap access ramp, and clean and remodel the exterior stonework. On February 16, 1993 a panel of this court issued its opinion reversing the district court because the new ordinance failed to provide sufficient judicial oversight, in violation of the First Amendment as espoused in *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228, 110 S.Ct. 596, 606, 107 L.Ed.2d 603 (1990). *See Graff v. City of Chicago*, 986 F.2d 1055 (7th Cir.1993). Chicago's motion to dissolve the injunction was denied as moot. On April 15, 1993, this court granted Chicago's petition for rehearing *en*

*banc* and vacated the panel opinion. After *en banc* review, we now affirm.

## II. Jurisdiction

■ In his complaint, Graff requested a preliminary injunction. He did not press the district court for an early hearing apparently because Chicago had not yet moved the bulldozers in for the kill. On May 14, 1992, however, Chicago notified Graff that he had fifteen days to vacate. A week later Graff filed an "Emergency Motion for Temporary Restraining Order and for Preliminary Injunction." Within the week the court dismissed counts one and two, and denied all injunctive motions as moot. In his notice of appeal, Graff sought review of the district court's order "denying the plaintiff's motion for a temporary restraining order, and granting, in part, defendant's motion to dismiss plaintiff's first amended complaint."

Initially, the City argues that we lack jurisdiction to hear this appeal because one count remains alive in the district court, and therefore, final judgment has not been entered. However, 28 U.S.C. § 1292(a)(1) grants us jurisdiction to hear certain interlocutory appeals, as when the district court refuses to enter an injunction. Here, the district court did just that; it refused to enter an injunction in favor of Graff by dismissing counts one and two of the complaint. *Holmes v. Fisher*, 854 F.2d 229, 230 (7th Cir.1988). It does not matter that Graff also sought review of the denial of his temporary restraining order (which is not yet appealable). *See Geneva Assurance Syndicate, Inc. v. Medical Emergency Servs. Ass'n*, 964 F.2d 599, 600 (7th Cir.1992) (per curiam). Therefore, we have jurisdiction to review the district court's refusal to enter an injunction and whether the district court properly dismissed counts one and two.

## III. Analysis

This case essentially involves two interdependent questions: whether the district court should have enjoined Chicago from removing Graff's newsstand and whether Chicago's newsstand ordinance is constitutional. We conclude that the statute is constitutional. Also, the district court acted properly in refusing to enter a preliminary injunction and in dismissing counts one and two. Graff attempts to have Chicago's newsstand ordinance declared unconstitutional in the hope that his newsstand stays put. However, without the newsstand ordinance, Graff still has no right to operate his newsstand on public property. Contrary to Graff's contentions about speech, this case involves a structure. Graff has no First Amendment right to build a structure on public property. The district court also acted properly in dismissing Graff's challenges to the new ordinance. The ordinance does not allow Chicago the opportunity to grant or deny newsstand permits because of the personal or institutional views of a government official. To the extent that the ordinance restricts the types of publications sold from a newsstand, the restrictions are reasonable. The ordinance contains reasonable time, place and manner restrictions, justified without reference to speech content, and leaves open alternative avenues to communicate the same information. We also conclude that the ordinance contains sufficient judicial review provisions and passes muster under Equal Protection analysis.

### A. Newsstand Structure

#### 1.

Chicago has passed numerous ordinances attempting to deal with the myriad of problems that arise on its public way, from carnivals to snow removal. Chicago Mun.Code §§ 10–28–010 to –800. Chicago asserts that this ordinance prohibits all vendors from building structures on the public way; newspaper vendors can erect a structure only after obtaining a permit. As a general starting point, unless another ordinance specifically authorizes otherwise, "no person shall erect or place any building, structure, or other stationary object, in whole or in part, upon any public way or other public ground within the city." *Id.* at –040. There are exceptions. "It shall be unlawful for any person to erect, place or maintain in, upon or over any public way or other public place in the city, any [stand] ... for the display or sale of goods, wares or merchandise ... unless a permit for the same shall be obtained from the superintendent of compensa-

tion...." *Id.* at –050. Specifically for newspaper vendors,

> It shall be unlawful for any person to erect, locate, construct or maintain any newspaper stand on the public way or any other unenclosed property owned or controlled by the city without obtaining a permit therefor from the commissioner of transportation as hereinafter provided.

*Id.* –130. In this case the parties have focused their arguments in the district court and on appeal on the constitutionality of Chicago's newsstand permit ordinance, *id.* at –130 to –196. Graff sought an injunction to prevent Chicago from removing his newsstand under the supposition that if the permit ordinance were declared unconstitutional, his newsstand should stay. But even without the challenged newsstand ordinance, Graff still has no right to occupy the public sidewalk; that is, unless he has a constitutional right to build or maintain a newsstand on public property. If the ordinance goes down (along with the availability of a permit) the newsstand goes down as well. As a preliminary matter, then, we must examine whether he has an independent constitutional right to erect his newsstand on the public sidewalk.

In *Lakewood* the city had "absolutely prohibited the private placement of any structure on public property." 486 U.S. at 753, 108 S.Ct. at 2142. The district court found that this prohibition violated the First Amendment as applied to newsracks. The city, however, did not appeal; rather, it enacted ordinances that permitted newsracks under certain conditions. The Supreme Court concluded that the new ordinances placed too much discretion with the city officials, thus rendering the ordinances unconstitutional. The Court did not reach the question of whether "a city may constitutionally prohibit the placement of newsracks on public property." *Id.* at 762 n. 7, 108 S.Ct. at 2147 n. 7. Today, with regard to newsstands, we reach that question.

▆ At the outset we note that no person has a constitutional right to erect or maintain a structure on the public way. In *Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341 (7th Cir.1990), the City had decorated O'Hare Airport with Christmas trees and other ornaments; persons desiring to display religious symbols were allowed to lease an area of the airport. The Lubavitch Chabad House, however, did not want to pay. The organization sought to display a free standing Chanukah menorah in one of the public areas. We held that the ordinance did not involve any form of constitutionally protected speech. *Id.* at 347. There is no

> private constitutional right to erect a structure on public property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures. Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will.

*Id.;* accord *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 813–15, 104 S.Ct. 2118, 2133–34, 80 L.Ed.2d 772 (1984).

Two years after we decided *Lubavitch,* the Supreme Court ruled that an airport was not considered a traditional public forum. The *Lubavitch* rule nevertheless stands that even in a public forum there is no constitutional right to erect a structure. 917 F.2d at 347. The structure of a Chanukah menorah deserves no less protection than the structure of a newsstand. The building of a newsstand is simply not a form of constitutionally protected expression. Thus *Lubavitch* is dispositive of Graff's request for an injunction. Requiring a permit for the structure is not a prior restraint on speech. While public forums certainly provide places where people have a right to express their views through handbills, literature and the spoken word, *Jamison v. Texas,* 318 U.S. 413, 416, 63 S.Ct. 669, 671, 87 L.Ed. 869 (1943), they do not have the right to erect a newsstand, in this case on a public sidewalk. Without an ordinance and the permit it requires, newsstands and other structures have no protection from the city's bulldozer.

2.

*Lubavitch* involved a structure used to advance speech and religion. Graff neverthe-

less maintains that Supreme Court precedent entitles structures for newspaper distribution to constitutional protection. In *Lakewood* a newspaper challenged a city ordinance that allowed the mayor to grant or deny permits to publishers to place their newsracks on public property. The mayor had to state specific reasons if he denied the application; in granting a permit, the mayor could add such terms and conditions he deemed reasonable and necessary. The newspaper elected not to apply for a permit, instead bringing a facial challenge to the ordinance. 486 U.S. at 754, 108 S.Ct. at 2142.

> [A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.... The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.

*Id.* at 759, 108 S.Ct. at 2145. The Court (in a four to three decision) found that the First Amendment was implicated because the specific ordinance involved newspapers and required them to renew their newsrack licenses annually. The Court saw the printing and circulation of newspapers as "conduct commonly associated with expression" and the periodic licensing scheme as closer to a regulation that allows the government to view actual speech content before issuing a permit.

Graff argues that newsracks and newsstands should receive identical First Amendment protection. But *Lakewood* does not so easily bridge the gap between newsracks and newsstands. They are significantly different methods of distribution and we must assess them on standards uniquely suited to each. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) ("Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems") (citations omitted).

■ Newsstands are large, permanent-type structures.[2] They are constructed, and once in place they are not easily moved. Newsstands do not present one viewpoint; rather they supply many and varying editorial opinions. Newsstands shelter a business operator and his operation; they do not merely dispense or hand deliver newspapers.[3] Newsstands also are more likely to obstruct the views of pedestrians and automobile drivers. In short, newsstands compared to newsracks are much larger, more permanent structures that occupy a significant portion of limited sidewalk space.[4] Thus, building and operating a newsstand is conduct, not speech, which the City can lawfully proscribe:

2. In *Lakewood* the newspaper publisher insisted that it was not seeking to rent or permanently build a structure on the sidewalk; the newsrack was characterized as similar to a newsboy, and the newsrack his "mechanical cousin." *Id.,* 486 U.S. at 778 n. 6, 108 S.Ct. at 2155 n. 6. This large, immobile and permanent newsstand is precisely what the publisher in *Lakewood* implied was unacceptable.

3. In *Lakewood,* 486 U.S. at 781–83, 108 S.Ct. at 2157, Justice White, in dissent, feared that equating newsracks with newsboys and conduct commonly associated with expression could allow newspaper publishers the right to take public property for private use. He concluded that such a comparison also ignored the governmental interests at stake: allowing all members of the public use of their streets and sidewalks, insuring the public's safety and aesthetic interests, especially where alternative methods of newspaper distribution are available. Although this argument was not successful as applied to newsracks, permanent newsstand structures present a much more imposing problem.

4. We disagree with Judge Cummings that "size itself suggests nothing about whether the selling of newspapers and magazines from a stand is speech or conduct." Cummings, J. opinion at 1336. Size is relevant, because at a certain size the city's unfettered ability to regulate structures eclipses its limited ability to regulate speech. The dissent will concede that the city can place a "prior restraint" on the construction of a ten story building on public property, even if the building happens to have a newspaper store on the first floor. The same is true for a five story building or a one story building. We submit that the same is also true for a newsstand on public property even if it is not true for a newsrack on public property. Size matters, and a newsstand is more closely related to a building than it is to a newsrack.

Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.

*Schneider v. State,* 308 U.S. 147, 160–61, 60 S.Ct. 146, 150–51, 84 L.Ed. 155 (1939); *accord Lee,* —— U.S. at ——, 112 S.Ct. at 2717 ("The principal purpose of streets *and sidewalks,* like airports, is to facilitate transportation, not public discourse." (emphasis added) (Kennedy, J., concurring)).

In *Lakewood* the Court concluded the ordinance implicated speech because it required periodic license renewal and the licensing system was "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." 486 U.S. at 760. This case neither concerns simply the circulation and printing of newspapers nor conduct commonly associated with expression. This case involves a structure. A newsrack, as a source of news, is inextricably tied to the publication it contains. For instance, Chicago has newsracks for the Chicago Tribune, the Chicago Sun–Times, USA Today, the Wall Street Journal, and whatever other publications might be popular in the city. To give a city official unfettered discretion over newsracks is to raise the possibility that the official—because of dissatisfaction over a particular editorial policy—might ban or severely limit the newsracks of a particular publication. For instance, if the official is lampooned by, say, the Chicago Tribune, as he or his boss makes a re-election bid, he would have an incentive to limit their newsracks. At the very least, the Chicago Tribune might limit its editorial efforts because of fear of such censorship.

The same threat of prior restraint does not exist for newsstands. They are structures not at all tied to particular publications. In our hypothetical, the Chicago official—even if he wanted to—could not retaliate against the Chicago Tribune by regulating newsstands. Only under the least likely scenario would a Chicago official be able to target a certain publication by targeting a certain newsstand. For a city official to accomplish this type of censorship, he would need a large staff to check all of the newsstands in the city to find the ones disseminating the objectionable material. Then he would have to deny permits to those newsstands. To "chill" similar distribution by others, he would have to make public that he was closing certain newsstands because they were distributing objectionable material. This scenario is hardly similar to one Chicago official nixing all of the newsracks of a certain publication by the stroke of his pen, while safely hidden behind the walls of city hall. So unlikely is the former scenario that the First Amendment does not require the ordinance to be drafted to avoid it. Further, the closing of newsstands would affect all of the publications in the newsstand equally, and the Chicago Tribune would still have its other methods of dissemination— newsboys, newsracks, in-building newsstands, etc.—to sell papers.

The protections provided newsracks are tailored to their peculiar characteristics. Judge Cummings' dissent and Judge Flaum's concurrence take the position that the same protections tailored to fit newsracks should be placed upon newsstands. But newsstands are not newsracks. The same threat of targeting one publication inherent in the regulation of newsracks is not present in the regu-

lation of newsstands. Judge Cummings' dissent offers a remote scenario where a city official might target certain "off-beat publications" or "pornographic" publications by targeting certain newsstands. Cummings, J. dissent at 1337–38. But the First Amendment does not require that we create unlikely scenarios for the censorship of speech and require city governments to draft their regulations to avoid these scenarios. Only when the ordinance at issue presents an obvious and immediate threat of censorship—as in the case of the newsrack ordinance in *Lakewood*—should we allow a facial challenge to head off the possibility of censorship. When the threat of censorship derives from the unlikeliest of scenarios—such as the targeting of "off-beat" or "pornographic" publications when issuing newsstand permits—a facial challenge is inappropriate. The threat is too remote and speculative.

Given that there is no constitutional right to build or maintain a newsstand on the public way, the district court properly refused to enjoin Chicago from removing Graff's newsstand. But Chicago is not interested in removing Graff's newsstand because it occupies public land. Rather Chicago wants to remove Graff's newsstand because he has no permit. Thus, the parties in this case did not focus their arguments on the propriety of whether the district court should have issued an injunction. They wanted a ruling on the constitutionality of the new ordinance. The district court obliged, and upheld the ordinance by granting Chicago's motions to dismiss. On appeal Graff claims the ordinance gives Chicago too much discretion, imposes unreasonable time, place and manner restrictions, does not provide sufficient judicial review, and denies equal protection by treating newsstands and sidewalk cafes differently. We will address each of these constitutional challenges.

*B. The Commissioner's Limited Discretion*

■ Graff argues that Chicago's newsstand ordinance violates the First Amendment by vesting too much discretion in the government official, here the commissioner of transportation. In *Lakewood* the Court

struck down the City's ordinance because it vested too much discretion in the hands of a government official. 486 U.S. at 772, 108 S.Ct. at 2152. Graff argues that such a danger of viewpoint discrimination also exists in this case.

"[A] licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Id.* at 757, 108 S.Ct. at 2143. A major premise in *Lakewood* was that "the Constitution requires that the City establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *Id.* at 760, 108 S.Ct. at 2146. The Court struck down the Lakewood ordinance specifically because there were "no explicit limits on the Mayor's discretion." *Id.* at 769, 108 S.Ct. at 2150. In denying a permit application, the mayor was required only to state "it is not in the public interest." Although the ordinance required the mayor to state his reasons, the Court found troubling the lack of specificity required and the limitless reasons the mayor could assert. *Id.* at 769–70, 108 S.Ct. at 2150–51. In granting a permit, the mayor could require the newsrack to be located "in an inaccessible location without providing any explanation whatsoever." *Id.* This constituted "unfettered discretion" abridging the First Amendment. *See FW/PBS*, 493 U.S. at 223, 110 S.Ct. at 603; *Freedman*, 380 U.S. at 56, 85 S.Ct. at 737 (party can "challenge a statute on the ground that it delegates overly broad licensing discretion"); *Thornhill v. Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 741–42, 84 L.Ed. 1093 (1939) (the offending statute subjected the defendant to "harsh and discriminatory enforcement by local prosecuting officials").

In this case the commissioner of transportation considers six exclusive criteria by which to grant or deny permission to build a newsstand:

(1) Whether the design, materials and color scheme of the newspaper stand comport with and enhance the quality and character of the streetscape, including nearby development and existing land uses; (2) Whether the newspaper stand complies with this code; (3) Whether the applicant has previ-

ously operated a newspaper stand at that location; (4) The extent to which services that would be offered by the newspaper stand are already available in the area; (5) The number of daily publications proposed to be sold from the newspaper stand; and (6) The size of the stand relative to the number of days the stand will be open and operating.[5]

Chicago Mun.Code § 10–28–160(a). The ordinance also contains a number of technical considerations, such as application forms, *id.* at –150, size and location regulations, *id.* at –170, and maintenance requirements, *id.* at –180. Graff specifically alleges that the commissioner should not be given discretion to remove a newsstand that "endangers public safety or property," that "interferes with or impedes the flow of pedestrian or vehicular traffic," or is placed "in such a manner as to impede or interfere with the reasonable use of [a display window]." *Id.* at –185(a) & (b).

By requiring the commissioner to consider these factors, his discretion is limited, not unbridled. The criteria give adequate and specific guidance to the commissioner as well as reasons for the applicant to anticipate the basis for granting or denying a particular permit to build a newsstand. If a permit to build a newsstand were denied, these express standards (and the commissioner's written reasons, *see id.* at –160(c)) give the plaintiff adequate guidance in challenging the application of the ordinance to his particular case, and upon judicial review allow an informed inquiry into whether the commissioner made his decision in an unconstitutional manner, such as by disfavoring certain speech.

Even though the ordinance allows the commissioner to use some discretion, *Lakewood* nevertheless required the law to have "a close enough nexus to expression, or to conduct commonly associated with expression, *to pose a real and substantial threat of the identified censorship risks.*" 486 U.S. at 759, 108 S.Ct. at 2145 (emphasis added). The criteria set out in Chicago's ordinance in no sense pose a "real or substantial threat" of censorship. *See Ward v. Rock Against Racism,* 491 U.S. 781 at 794–95, 109 S.Ct. 2746 at 2755–56 (upholding as content-neutral regulations aimed at achieving the best musical volume and sound or appropriate sound quality in light of surrounding neighborhoods). *Jacobsen v. Crivaro,* 851 F.2d 1067, 1070 (8th Cir.1988) (upholding as non-discretionary an ordinance restricting newsrack locations and sizes). The criteria give the commissioner proper authority to advance the city's desire to permit a given number of newsstands. At the same time they help avoid the threat of someone building a permanent newsstand of whatever size, design and location he chooses.

Graff still finds a problem with what he terms the commissioner's unbridled discretion in determining the number of permits to issue. But the ordinance caps the number of permits the commissioner may issue to the number of newsstands already located on Chicago's streets. Chicago Mun.Code § 10–28–130 ("No new permit for a newspaper stand shall be issued on or after the effective date of this ordinance"). As permits expire, or have been revoked, the commissioner may advertise that a permit is available. *Id.* at –130 & –135. Graff and others may compete for those the commissioner chooses to reissue. *Id.* at –160(e).[6]

■ True, the commissioner has discretion in determining how many permits to reissue.

---

**5.** Under the new ordinance, all existing newsstand permits expired on January 1, 1992. Chicago Mun.Code § 10–28–135. Although Graff has operated his newsstand since 1984, he has not operated under a permit. Presumably he must now compete for a permit on the same basis as any other person. As such, "when two or more otherwise equally qualified application are pending ... preference shall be given to the application for the newspaper stand offering the largest number of different daily publications." *Id.* at –160(e). Once Graff is issued a permit under the new ordinance, the Commissioner's only consideration in not renewing it is whether the newspaper stand has complied with the code. *Id.* at –135(a) & –160(b).

**6.** In a footnote in his reply brief, Graff argues for the first time that the current restrictions on the number of permits issued is a codification of arbitrary practices under the old ordinance. This argument is waived. Fed.R.App.P. 28(f) ("A reply brief shall be limited to matter in reply."). The parties also have not addressed the extent to which having a permit under the old ordinance affects the locations of future newsstands. These issues are not properly before us on appeal.

But that is "the business of government." *Chicago Observer, Inc. v. City of Chicago*, 929 F.2d 325, 329 (7th Cir.1991). Not all discretionary decisions implicate the First Amendment. *See City of Cincinnati*, —— U.S. at ——, 113 S.Ct. at 1517 (the City may limit the total number of newsracks for safety and aesthetic reasons). Since the limited discretion given to the commissioner in Chicago's ordinance does not in any way limit the speech content of the newsstand operator, there is no threat or risk of censorship which violates the First Amendment.

## C. *Reasonable Time, Place and Manner Restrictions*

If the government seeks to control speech without reference to viewpoint, ordinances can contain reasonable time, place and manner restrictions. These restrictions, however, must serve significant government interests (narrowly tailored) and leave alternative avenues to communicate the same information. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989); *Clark*, 468 U.S. 288 at 293, 104 S.Ct. 3065 at 3069, 82 L.Ed.2d 221. If, however, the ordinance discriminates on the basis of viewpoint, such as allowing only communication of particular political or religious messages, the government would face a near insurmountable burden. *See City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, ——, 113 S.Ct. 1505, 1516, 123 L.Ed.2d 99 (1993) (noting that prohibiting the use of sound trucks because of noise must apply equally to "music, political speech, and advertising."). Graff alleges that the ordinance controls speech content in several ways. Because the ordinance permits the newsstand to carry only newspapers, periodicals and similar publications, and favors the applicant who will carry the most daily publications, he claims it eliminates vendors who carry other expressive materials. He also complains that the newsstands' size limitation magnifies these impermissible restrictions. Chicago does not dispute these characteristics; rather it argues that they are necessary and reasonable time, place and manner restrictions.

This case resembles *City of Renton*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29. There the City of Renton, Washington, enacted a zoning ordinance to prohibit adult motion picture theaters from locating within a certain distance from residential, church, or school property. *Id.* at 43, 106 S.Ct. at 926. The Supreme Court determined that the ordinance

> does not appear to fit neatly into either the "content-based" or the "content-neutral" category. To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters. Nevertheless, as the district court concluded, the Renton ordinance is aimed not at the content of the films shown at "adult motion picture theatres," but rather at the secondary effects of such theaters on the surrounding community.

*Id.* at 47, 106 S.Ct. at 929. The Court analyzed the ordinance by looking at the time, place and manner restrictions in the regulation. The Court held that the ordinance was justified without reference to content, was thus "content-neutral," *id.* at 48, 106 S.Ct. at 929, and served a substantial government interest while allowing for reasonable alternatives of communication. *Id.* at 53, 106 S.Ct. at 933. Surely if a city can restrict speech through the planning, regulation, and zoning of property because of the secondary effects of adult motion pictures on the neighborhood, *id.*, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976), Chicago should be allowed to regulate property on which newsstands could be located. *Accord Cornelius*, 473 U.S. at 799–800, 105 S.Ct. at 3447–48 ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."). Here the time, place and manner restrictions are entirely reasonable.

■ Graff asserts that there is no showing that accommodating multiple uses of the public way and public safety requires an arbitrary size limitation on newsstands. The

ordinance requires that the newsstand not occupy more than one-hundred and twenty square feet nor stand more than nine feet in height. Chicago Mun.Code § 10–28–170. In addition, the newsstand must always allow pedestrians at least six feet of clear passage, and cannot be located within three feet of a property line. *Id.* at –185(b). This is "the business of government." *Chicago Observer,* 929 F.2d at 329. We are not in a position to second-guess the city council's concerns. In any event, these restrictions are eminently reasonable. Pedestrians certainly should have access to enough space to walk on the sidewalks. Where structures block part of the sidewalk, pedestrians also have an interest in how far they must walk to get around them. In addition to being reasonable, these restrictions are content-neutral and do not constitute a prior restraint.[7]

■ Chicago readily admits that the "intended function" of the ordinance "is merely a preference for newsstands that maximize the number of newspapers sold." Apparently Graff wants to carry more than newspapers, periodicals and similar publications. He asserts that the ordinance is content-based because it does not allow newsstands to sell books or videotapes, relying on *Discovery Network, Inc. v. City of Cincinnati,* 946 F.2d 464 (6th Cir.1991).[8] There the district court held unconstitutional an ordinance that completely prohibited the distribution of commercial handbills on public property. The city had asserted its interests in safety and aesthetics, although it allowed newsracks to carry all other publications. The court of appeals concluded that the ordinance was an impermissible content-based restriction. 946 F.2d at 472, *aff'd,* — U.S. at ——, 113 S.Ct. at 1516. In distinguishing *City of Renton,* the Sixth Circuit stated: "Had Cincinnati

produced evidence that the types of newsracks distributing commercial speech caused effects distinct from newsracks distributing newspapers, such as the clogging of downtown streets, ... the ordinance may have been constitutional under the secondary effects doctrine." *Discovery Network,* 946 F.2d at 472 n. 12. In affirming, the Supreme Court also noted that in contrast to *City of Renton* there were no distinguishing secondary effects attributable to newsracks containing commercial publications as compared to newsracks containing newspapers that would justify differing treatment. *City of Cincinnati,* — U.S. at ——, 113 S.Ct. at 1517. Chicago, following this reasoning, notes that newspapers do not represent any favored viewpoints not represented in books or videotapes. The restrictions are "simply an effort to reduce clutter on the public way, ... and facilitate the distribution of newspapers from a newsstand without undue obstruction of the public ways."

Certainly a city can regulate newsstands to reduce clutter on its streets. *See Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. at 2128. But Chicago has advanced no argument that books and videotapes clutter the streets any more than do newspapers. The assertion that newsstands themselves clutter the streets merely restates the issue. Chicago more convincingly argues that books and videotape sales would obstruct the flow of pedestrians. The city can recognize that people impulsively or routinely purchase newspapers in seconds. The more time-consuming purchase of books or videotapes, in contrast, would cause congregation and impede the flow of others who would then have to walk around not only the newsstand structure but the audience it attracted. *See Hef-*

---

**7.** *See Chicago Observer,* 929 F.2d at 328; *Jacobsen,* 851 F.2d at 1070; *International Caucus of Labor Comm. v. City of Chicago,* 816 F.2d 337, 340 (7th Cir.1987) (upholding restrictions on physical props used to spread message based on the size of the property and public safety); *see also Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707, 106 S.Ct. 3172, 3177, 92 L.Ed.2d 568 (1986) ("the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books"); *Heffron v. International Soc'y for Krishna Conscious-*

*ness, Inc.,* 452 U.S. 640, 644 n. 4, 101 S.Ct. 2559, 2562 n. 4 (1981) (noting that there was no First Amendment violation when several hundred potential exhibitors were prevented from speaking because of the cap on booths and a "first come—first serve" policy).

**8.** *Discovery Network,* 946 F.2d 464, was affirmed after the parties had completed briefing and while the appeal was pending. *City of Cincinnati v. Discovery Network, Inc.,* — U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

*fron,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298. Also, browsers would block access to those who wanted to make a quick purchase of a newspaper. *See Gannett Satellite Info. Net. v. Metro Transp. A.,* 745 F.2d 767, 773–4 (2d Cir.1984) (upholding as content neutral a regulation which allowed newspapers but not other vendors to install coin operated vending machines; "the newspapers are in a privileged position and are not and will not become the victims of discrimination").

That the ordinance considers how many publications the newsstand will carry does not infringe, but rather promotes First Amendment interests. The ordinance clearly favors an applicant who has the higher, not the lower, proposed number of publications to be sold from the newsstand. This conceivably "censors" only the newsstand operator who himself might eliminate certain publications from distribution. In addition, an ordinance directed at the number of publications concerns quantity, not quality or content. Graff cites no case where an ordinance promoting more speech (in general) infringes the First Amendment.

Graff asserts that promoting the dailies serves to advance a message less controversial to the greatest number of people. This ignores the reality of the marketplace. The dailies succeed only because they sell to the greatest number of people, notwithstanding the government's perceived agreement with any particular viewpoint. Any notion that Chicago is promoting the dailies because based on past experience it is likely to agree with their future viewpoints is mitigated by the ordinance favoring the newsstand operator who sells the most dailies—an obvious attempt at variety, not indoctrination. Chicago argued in the district court that the Supreme Court has encouraged the promotion of daily publications over the sale of other "expressive materials." As stated in *Lakewood,* 486 U.S. at 771, 108 S.Ct. at 2151, "News is not fungible. Some stories may be particularly well covered by certain publications, providing that newspaper with a unique opportunity to develop readership. In order to benefit from that event, a paper needs public access at a particular time; eventual access would come too little and too late." The manner in which this ordinance regulates the newsstand operation allows that necessary access.

Graff finally argues that the time, place and manner restrictions are not narrowly tailored to serve the asserted governmental interests. *See Ward,* 491 U.S. at 796, 109 S.Ct. at 2756; *City of Los Angeles v. Preferred,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986). Specifically, Graff argues the ordinance sets an arbitrary cap on the number of permits and that given the provision requiring minimum clearance around the newsstand, there is no reason for the arbitrary size limitation. He wants further discovery to show there are less restrictive alternatives.

■ The "requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758 (citations omitted). This test is not as heightened as Graff would have us believe.

> So long as the means chosen are not substantially broader than necessary to achieve the government's interest, ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

*Id.* at 800, 109 S.Ct. at 2758. Because Chicago has the ability to ban all newsstands, providing for some by a comprehensive permit scheme serves the people of Chicago well. The ordinance accommodates competing interests where pedestrians wish room to walk, several newsstand operators desire the same location, and tourists wish to take a picture of a famous landmark without a newsstand front and center. Without the permit ordinance, Chicago's interests would not only be achieved with less effectiveness, but would fail. The restrictions also leave open alternative channels for communication of the information. *Id.* at 802, 109 S.Ct. at 2760. Chicago not only "teems with ads and with publications," *Chicago Observer,* 929 F.2d at 328, one can easily discern that the public has no problem picking up a newspaper, book or videotape, be it in stores that

actually own their own property or from newsboys yelling out the headlines.

For the foregoing reasons, we conclude that the time, place and manner restrictions contained in the new ordinance are reasonable, are justified without reference to specific content, and are narrowly tailored to serve significant interests of the people of Chicago. Alternative channels are also available to communicate any speech otherwise restricted.

### D. The Propriety of Dismissal Versus Summary Judgment

■ The district court dismissed two counts of the complaint based in part on the reasonableness of the ordinance's time, place and manner restrictions. Graff argues that the pleading stage is no place for such an inquiry, especially because the government has the burden on this issue. *See Preferred,* 476 U.S. at 496, 106 S.Ct. at 2038; *accord Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (invalidating state procedure because it placed the burden on the individual to show the restriction on speech was unjustified). No doubt the norm is to wait until the summary judgment stage of the litigation to address the ultimate question of whether the ordinance should stand. *FW/PBS,* 493 U.S. at 221, 110 S.Ct. at 602; *Renton,* 475 U.S. at 45, 106 S.Ct. at 927; *Vincent,* 466 U.S. at 793, 104 S.Ct. at 2122; *Young,* 427 U.S. at 55, 96 S.Ct. at 2445. And Chicago does not dispute that it bears the burden on these issues. Contrary to Graff's assertions, however, in this case the district court was correct in resolving this matter.

■ In *International Caucus of Labor Committees v. City of Chicago,* 816 F.2d 337, 339 (7th Cir.1987), the district court dismissed a facial attack on an ordinance that prohibited persons from setting up tables, hanging signs and storing literature at O'Hare International Airport. We had previously upheld parts of a similar ordinance in *International Society for Krishna Consciousness, Inc. v. Rochford,* 585 F.2d 263 (7th Cir.1978). The court, quoting from Supreme Court precedent, gave credence to the government's case at the pleading stage:

A state's interests in protecting the safety and convenience of persons using the public forum is a valid governmental objective. The characteristic nature and function of the forum must be considered in assessing the constitutionality of the regulation.... As held in *Rochford,* the City has valid concerns about expediting the processing of travelers, maintaining the free and orderly flow of traffic, and avoiding the disruption of normal airport activities. Prohibitions on the use of banners or signs that exceed the body width and on the storing of materials, except in a carry bag that must be carried or harnessed, are reasonably related to the City's legitimate interests.

*International Caucus,* 816 F.2d at 339–40 (citations and quotations omitted). As we have seen, Chicago asserted that many of these interests apply in this case as well. In *International Caucus,* we concluded that even in the First Amendment context, the plaintiff is not excused "from the requirement that the facts as alleged must state a cause of action." *Id.* at 340.

In *Rothner v. City of Chicago,* 929 F.2d 297 (7th Cir.1991), we also affirmed the district court's dismissal of a facial challenge to a city ordinance. Chicago had prohibited minors from playing video games while school was in session. With the caveat that "courts should proceed cautiously when asked to dismiss on the basis of the pleadings," *id.* at 302, we concluded that the purpose of the ordinance, to encourage students to complete high school and discourage truancy, was unrelated to speech content. Also, the ordinance was narrowly tailored to serve an important governmental interest, namely "insuring that children receive an adequate education." *Id.* at 303. And alternative channels of communication were open—the children were free to play the video games on their own time. There, we concluded that the First Amendment did not require us to "try the statute" beyond the pleading stage. *Id.* at 304 (citations omitted).

■ From *Preferred, International Caucus* and *Rothner* we gather several important principles. Courts should not merely assume that an ordinance advances the state's inter-

ests. *Preferred,* 476 U.S. at 496, 106 S.Ct. at 2038. In *Preferred* the Court remanded to the district court because it needed to "know more about the present uses of the public utility poles and rights-of-way and how respondent proposes to install and maintain its facilities on them." *Id.* at 495, 106 S.Ct. at 2038. In this case, however, no one is questioning the present uses of newspapers or sidewalks on the streets of Chicago. How Graff proposes to use his newsstand we accept as true from his complaint. *See City of Renton,* 475 U.S. at 53, 106 S.Ct. at 931. (City does not have to conduct studies or produce independent evidence on issues that are well developed here or elsewhere). Where the courts have already upheld a similar ordinance because of the governmental interests at stake, a future litigant should not be able to challenge similar governmental interests without showing some distinction at the pleading stage. *E.g., International Caucus,* 816 F.2d at 340.

In this case there are no disputed issues of material fact that we need to resolve. Nor are the interests that Chicago raises in this case unique or different. It has not relied on independent research studies or findings. Rather, Chicago has relied on a common sense approach and the desire to best allocate public property within the spirit of the First Amendment. As discussed in Part C, we conclude that as a matter of law Chicago can reasonably restrict newsstands to selling daily newspapers. Thus, the district court properly dismissed at the pleading stage Graff's arguments that the ordinance should allow him to operate a larger newsstand in which to sell books, videotapes and other methods of expression.

### E. *The Adequacy of Procedural Safeguards*

Graff asserts that the ordinance is completely devoid of safeguards for review of the commissioner's decision. Chicago responds that state law provides for judicial review, which in itself is sufficient. Primarily, the First Amendment protects speech by prohib-

iting the government from engaging in censorship. But even if an ordinance properly limits an administrator's discretion, theoretically the government could still act improperly where its decision is not subject to review. The question is whether sufficient procedural safeguards exist to "obviate the dangers of a censorship system." *Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. at 1247. In *Freedman of Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965), the Court set out certain "safeguards," later summarized by Justice Brennan as follows:

> (1) any prior restraint in advance of a final judicial determination on the merits must be no longer than that necessary to preserve the status quo pending judicial resolution; (2) a prompt judicial determination must be available; and (3) the would-be censor must bear both the burden of going to court and the burden of proof in court.

*FW/PBS,* 493 U.S. at 239, 110 S.Ct. at 611.[9] Of concern to Graff, since he has no permit, are the procedures Chicago follows in removing a newsstand without a permit. Once the commissioner discovers a newsstand operating on public property without a valid permit, the commissioner has the authority to give the operator fifteen days after the posting of a removal notice to restore the public property to its original condition. Chicago Mun. Code § 10–28–190(c). Within that time the owner or operator may request a hearing before the commissioner of transportation, which will be scheduled within thirty days. Even if the commissioner were to rule unfavorably, the operator would not have to remove his newsstand until fifteen days after the commissioner's final decision. Whether a newsstand is ordered removed, or a permit is granted, denied or renewed, the ordinance leaves these final determinations solely in the hands of the commissioner of transportation. But there is much opportunity for input and

---

9. In *FW/PBS* a plurality (O'Connor, Stevens and Kennedy, JJ.) found that "the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained and there

discussion before that final determination is made.[10]

■ Graff argues that the ordinance does not provide for "expeditious judicial review" of the commissioner's decision. *See FW/PBS*, 493 U.S. at 239, 110 S.Ct. at 611.[11] The ordinance contains no mention of the role of the judiciary in reviewing the commissioner's decisions. As an initial matter, it is not clear why the Court in *Freedman* set out the apparent requirement that an ordinance such as this explicitly provide for prompt judicial review. A person always has a judicial forum when his speech is allegedly infringed. Neither Graff nor the City argues that the judiciary cannot hear challenges to this ordinance simply because it does not have a specific provision designating a review process. The lack of these additional procedural safeguards does not in any way increase the threat of speech censorship. The "safeguards" or the absence thereof neither expand nor detract from the courts' jurisdiction over constitutional questions. But we are not writing on a clean slate.

The Constitution of the State of Illinois, Article 7, Section 6 (1970), delineates the explicit powers of home rule units (which the parties do not dispute includes Chicago). *See City of Chicago v. State & Mun. Teamsters*, 127 Ill.App.3d 328, 82 Ill.Dec. 488, 492, 468 N.E.2d 1268, 1272 (1984). "A home rule unit may exercise any power and perform any function pertaining to its government and affairs." Ill. Const. art. 7, § 6(a). The Supreme Court of Illinois took little time in holding that this power does not include providing for judicial review of administrative agency decisions. *Paper Supply Co. v. City of Chicago*, 57 Ill.2d 553, 317 N.E.2d 3, 16–17 (1974); *Cummings v. Daley*, 58 Ill.2d 1, 317 N.E.2d 22, 23 (1974). In each of those cases the Supreme Court of Illinois rejected a home rule municipality's attempts to determine "both the jurisdiction of the circuit court to review its municipal administrative determinations and the procedure to be followed in seeking judicial review of those determinations." *Nowicki v. Evanston Fair Housing Review Bd.*, 62 Ill.2d 11, 338 N.E.2d

must be the possibility of prompt judicial review in the event that the license is erroneously denied." 493 U.S. at 228, 110 S.Ct. at 606. Justices White and Scalia and Chief Justice Rehnquist did not apply any of the "safeguards." And Justices Brennan, Marshall and Blackmun would have applied all three. The Court considered the nature of the speech and the discretion in the ordinance when determining to what extent the *Freedman* safeguards were necessary. Thus, if the full procedural protections of *Freedman* are not necessary in the context of sexually oriented licensing schemes, *FW/PBS*, 493 U.S. at 228, 110 S.Ct. at 606, it is an open question whether they are necessary in an ordinance that regulates the building of newsstands on public property.

10. In this case Chicago utilizes the usual procedure in ruling on a permit application—set up more than one level of inquiry and get as many people involved in the process as possible; public hearings, of course, are necessary, at least politically. To begin the process, the commissioner of transportation advertises the availability of newsstand permits (in a newspaper, of course) and shortly thereafter accepts applications. Chicago Mun.Code § 10–28–135. Copies are soon distributed to the commissioner of planning and development and the alderman of the ward affected. The appropriate city council committee is also involved in holding public hearings on the permit. All interested persons, including the applicant, are given an opportunity to speak. The city council committee submits its recommendation to the commissioner of plan-

ning and development. He then submits a report to the commissioner of transportation, who gives the previous recommendations "due consideration," and acts on it within thirty days of that receipt. *Id.* at –160(a). All are bound by the six enumerated considerations, listed *supra*. The total time from application to decision can be no less than thirty-five and no more than sixty-five days. If the application is denied, the applicant can request a hearing before the commissioner of transportation which must be held within the next thirty days (a quasi-motion for reconsideration). *Id.* at –160(c).

11. In *FW/PBS* the Court held that the city of Dallas need not bear the burden of going to court nor the burden of proof once in court for two reasons: The ordinance was not presumptively invalid because the decisionmaker did not pass "judgment on the content of any protected speech." Also, "[b]ecause the license [or in this case, a permit] is the key to the applicant's obtaining and maintaining a business, there is every incentive for the applicant to pursue a license denial through the court." 493 U.S. at 229–30, 110 S.Ct. at 606. These same reasons apply in this case. We have already held that the ordinance does not give the commissioner unfettered discretion and that any content restrictions are reasonable. Graff's newsstand is also as much a business as an adult book store. Therefore, Chicago need not prove its case in court before ruling on a permit application or removing a newsstand.

186, 187 (1975); *see Quinlan & Tyson, Inc. v. City of Evanston,* 25 Ill.App.3d 879, 324 N.E.2d 65 (1975). Just because Chicago lacks the separate authority to make available "expeditious judicial review," *FW/PBS,* 493 U.S. at 239, 110 S.Ct. at 611, does not mean that such review does not exist.

The appropriate method to review Chicago's administrative agency decisions is by the common law writ of *certiorari. Holstein v. City of Chicago,* 803 F.Supp. 205, 210 (N.D.Ill.1992); *Stratton v. Wenona Comm'n Unit Dist. No. 1,* 133 Ill.2d 413, 141 Ill.Dec. 453, 458, 551 N.E.2d 640, 645 (Ill.App.1990); *Norton v. Nicholson,* 187 Ill.App.3d 1046, 135 Ill.Dec. 485, 491, 543 N.E.2d 1053, 1059 (1989). Unless excused, claimants have six months to file, wherein review "is extremely broad in scope, and extends to all questions of fact and law contained in the record before the court, including *de novo* review of any constitutional issues." *Holstein,* 803 F.Supp. at 210, *citing Howard v. Lawton,* 22 Ill.2d 331, 175 N.E.2d 556, 557 (1961).

> [T]he court determines from the record alone whether there is any evidence fairly tending to support the order reviewed, and the court cannot set aside the order unless it is contrary to the manifest weight of the evidence.... [F]indings and conclusions on questions of fact are *prima facie* true and correct. It is not the court's function to resolve conflicting evidence.

*Norton,* 187 Ill.App.3d 1046, 135 Ill.Dec. 485, 543 N.E.2d at 1059. "If the circuit court, on the return of the writ, finds from the record that the inferior tribunal proceeded according to law, the writ is quashed; however, if the proceedings are not in compliance with the law, the judgment and proceedings shown by the return will be quashed." *Stratton,* 133 Ill.2d 413, 141 Ill.Dec. 453, 551 N.E.2d at 645.[12]

In some other First Amendment cases the Supreme Court seemed to require an ordinance to provide for judicial review, even when the writ of common law *certiorari* was available. However, the Court has not been presented directly with the argument that *certiorari* was in itself sufficient review, especially where a state makes the common law writ the current common practice, and in fact forbids any other kind of review. We conclude that such review is sufficient. Illinois has shown that a judicial forum is available to review administrative agency decisions. The state maintains uniform judicial review procedures by forbidding home rule units such as Chicago from commenting on the matter. As such the state can expect such uniform procedures to expedite cases and better serve the interests of Graff in a case such as this one.

### F. Equal Protection

■ In count two, Graff alleges that newsstands are treated differently than other permitted uses of the public way, such as sidewalk cafes. One would hope so. Differences are obvious. Each use requires a permit, but separate ordinances necessarily provide different criteria for issuing them. Where, as here, the newsstand ordinance passes strict scrutiny under the First Amendment, it most certainly will pass the rational basis test under equal protection analysis.

> [E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is any reasonably conceivable state

---

**12.** The case of *Smith v. Department of Public Aid,* 67 Ill.2d 529, 10 Ill.Dec. 520, 367 N.E.2d 1286 (1977), helps illustrate the importance of the common law writ of *certiorari* in the constitutional context. In *Smith* a county public aid department increased the purchase price for food stamps. A state department of public aid affirmed that decision. On writ of *certiorari* the trial court declared certain state and federal statutes unconstitutional. In particular, the trial court found that the Illinois Public Aid Code,

Ill.Rev.Stat.1975, ch. 23, par. 11–8.7, and a portion of the federal food stamp program, 7 U.S.C. § 2022 (1970), deprived the plaintiffs of due process and equal protection under the Illinois Constitution and the Fifth and Fourteenth Amendments to the United States Constitution, because they did not provide for sufficient judicial review. 67 Ill.2d 529, 367 N.E.2d at 1292. The Supreme Court of Illinois reversed, holding that the common law writ of *certiorari* provided sufficient oversight. *Id.* at 1293.

of facts that could provide a rational basis for the classification.

*Federal Commun. Comm. v. Beach Commun., Inc.,* —— U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). We have already explained why the ordinance infringes no fundamental First Amendment right.[13] If reasonable time, place and manner restrictions outweigh Graff's right to free speech, they certainly are sufficient to pass as "conceivable" and "rational."

Graff argues that Chicago taxes newsstands but not other uses of the public way. Chicago responds that Graff waived the argument because in the district court he questioned only the propriety of a newsstand fee as an invalid prior restraint under the First Amendment, an issue he has not raised on appeal. Graff also argues that newsstands and sidewalk cafes are treated differently with respect to landmark commission approval. Chicago disputes this. It argues Chicago Municipal Code section 2–120–740 subjects all structures on public property to equal treatment. In fact, it argues that section 4–384–060 gives the City even more discretion in refusing to grant a cafe permit (as compared to refusing a newsstand permit).

These distinctions do not really matter. Varying taxes and different permit requirements for obviously different uses do not merit word-by-word scrutiny by judges who might prefer to tax and regulate some other way. The question is whether the different treatment of newsstands and cafes occupying the public sidewalks are for "conceivable" and "rational" reasons. We can conceive of many rational reasons for the differences,[14] not the least of which one serves food (a highly regulated enterprise) and the other does not. The only real similarity is that they occupy the sidewalk. It would arguably be irrational to treat these completely different purposes the same way. In fact, equal treatment with a sidewalk cafe would probably result in much more burdensome limitations for a newsstand anyway. Chicago has a very rational basis for mandating different

13. Graff alleged in his amended complaint and in the facts section of his brief on appeal that then and now newsstands have operated on the public way without permits and only Graff has been targeted for eviction. Why was this not pursued in response to Chicago's motion to dismiss? If Chicago was allowing newsstands without permits, surely it could not seriously argue that it could remove a newsstand that had not secured one. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 295 n. 6, 104 S.Ct. 3065, 3070 n. 6, 82 L.Ed.2d 221 (1984). Obviously there would be no need for the district court to rule on the constitutionality of an ordinance on its face when it was being applied in such a random fashion. Indeed, the record shows that Graff received notices to remove his newsstand which for whatever reasons were later rescinded. Graff, however, raised the equal protection analysis only in arguing that Chicago discriminated by its treatment of newsstands as compared to other, nonexpressive uses of the public way. He did not explicitly or implicitly argue any disparity in requiring newsstand permits to the district court or on appeal; thus, the issue is; waived. *Brookins v. Kolb,* 990 F.2d 308, 316 (7th Cir.1993); *Textile Banking Co. v. Rentschler,* 657 F.2d 844, 853 (7th Cir.1981). We have proceeded in this case on the assumption that Chicago evenhandedly enforces its ordinances.

14. Chicago could reasonably feel that newsstands impede the flow of pedestrian traffic more so than sidewalk cafes. Cafes involve a restaurant that seeks to extend its eating facility to the fresh air. It is reasonable for Chicago to believe that newsstands will not ordinarily attach to nearby buildings. They are free standing on the sidewalk, thus requiring size limitations so as to accommodate adjacent structures. For pedestrians wishing to determine whether it is safe to cross the street, or for drivers wishing to avoid hitting pedestrians, cafes pose less serious threats to safety. It is not only conceivable, but probably a certainty, that many cafes are located in front of property already in use as a restaurant. Extending that type of business onto part of the sidewalk would compromise landmark property no more than the restaurant operating there in the first place. Newsstands, by contrast, stick out; Chicago could feel that such structures are not as aesthetically pleasing. They are separate entities usually having nothing to do with adjoining property. Chicago should be given deference in asserting that lack of patrons would run unattractive cafes out of business, giving them ample incentive to maintain aesthetically pleasing premises. Persons merely wanting a newspaper probably do not regard the beauty of the newsstand of any consequence. Cafes require sufficient space to accommodate sitting customers and tables for food. Newsstands, in contrast, differ radically in the amount of space necessary, and employ fewer people. Eating establishments are heavily regulated and taxed in their own right.

permit requirements for these very different uses.

### IV. Conclusion

Graff does not have a constitutional right to build a newsstand on public property. This case involves a structure which in itself has no First Amendment protection. Thus, the district court properly refused to enter a preliminary injunction, notwithstanding the validity of a permit ordinance. Even if newsstands involve speech, Chicago's new ordinance passes muster. The ordinance does not allow for content based discrimination by giving the commissioner of transportation too much discretion in ruling on a permit. To the extent that the ordinance restricts speech, Chicago has articulated reasonable time, place and manner restrictions to justify any infringement. The ordinance is also subject to adequate procedural safeguards; therefore the district court was correct in dismissing count one. Because the ordinance is constitutional under Equal Protection analysis, the court was correct in dismissing count two.

The district court is AFFIRMED.

FLAUM, Circuit Judge, with whom CUDAHY, Circuit Judge, joins, concurring.

I concur in the judgment of the majority but write separately to emphasize my belief that the erection and maintenance of newspaper stands qualifies as "conduct commonly associated with expression." *City of Lakewood v. Plain Dealer Publishing Co.*, 486

U.S. 750, 759, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988). Accordingly, Chicago's licensing ordinance (hereinafter "the Ordinance") implicates the First Amendment's protection of expression, *see id.* at 769, 108 S.Ct. at 2150, and a facial challenge against it lies if the Ordinance carries with it significant risks of self-censorship and of postdecision difficulty in detecting whether censorship motives clandestinely prompted license denials, *see id.* at 759, 108 S.Ct. at 2145. Because Chicago's scheme at the outset establishes a discretionary system to govern the issuance of permits, the specter of these risks looms and a facial review of the ordinance is in order. Scrutiny of the Ordinance's provisions, however, reveals that the danger of content-based censorship presented by such licensing schemes is in this case sufficiently mitigated to allow the Ordinance to survive facial attack. In addition, I do not feel that the Ordinance is the kind of scheme for which the lack of a special provision for prompt judicial review is fatal.[1]

### I.

I respectfully suggest that the majority misses the mark in asserting that "[t]his case neither concerns simply the circulation and printing of newspapers nor conduct commonly associated with expression." *Ante,* at 1316. Like newsracks, newsstands are in the business of circulating expressive materials. *See City of Lakewood,* 486 U.S. at 768, 108 S.Ct. at 2149. That they do so on a larger scale, with greater variety[2] and take up

---

1. I do not think it is necessary for the majority to reach the question of whether or not there is an independent constitutional right to erect newsstands on public property. Because Chicago did not enact an absolute ban on newsstands and the majority today finds that capping permits at their historical level is a reasonable restriction, passing on this question is not necessary for the resolution of this case. Comment on the nonexistence of such a right may be tempting but is probably unadvised as the issue is by no means settled. *Compare Providence Journal Co. v. City of Newport*, 665 F.Supp. 107, 112 (D.R.I.1987) (intimating that a total prohibition of newsracks, newsstands and newsboys may be unconstitutional), *and City of Lakewood*, 486 U.S. at 762 n. 7, 108 S.Ct. at 2147 n. 7 (declining to pass on whether a city may constitutionally prohibit the placement of newsracks on public property),

*with id.* at 780–81, 108 S.Ct. at 2156 (White, J., dissenting) (stating that there is no First Amendment right to erect newsracks on city streets) *and City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, ——, 113 S.Ct. 1505, 1525, 123 L.Ed.2d 99 (1993) (Rehnquist, C.J., dissenting) (same).

2. The majority seems to suggest that because newsstands facilitate the distribution of many different publications they are somehow *less* associated with expression than newsracks which typically only offer for sale a single publication. *See ante,* at 1316. The majority apparently believes this follows from the fact that shutting down whole newsstands because of displeasure with one publication is a more awkward and less effective means of censoring that publication than targeting its individual newsracks directly.

more physical space in performing their distributive function does not alter the fundamental fact that maintaining a newsstand, just like maintaining a newsrack, is an activity peculiarly linked to expression. In that respect a newsstand is not like a candy machine or a hot dog stand or any other mere "structure." *See id.* at 760–61, 108 S.Ct. at 2145–46. A newsstand is an instrument for the dissemination of expressive materials, and as such it falls within that special category of activities whose regulation implicates First Amendment values.

Since this licensing scheme is "directed narrowly and specifically at ... conduct commonly associated with expression," *id.* at 760, 108 S.Ct. at 2145, a facial challenge is an appropriate means to test for constitutional infirmity when by its nature the scheme does not foreclose the "identifiable risks to free expression," *id.* at 757, 108 S.Ct. at 2144, that a system of prior restraint engenders and that can be "effectively alleviated only through a facial challenge." *Id.* Now the Ordinance does not fit the traditional mold of a prior restraint since it does not directly regulate speech *qua* speech. *See, e.g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 552, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975) (city preventing performance of rock musical "Hair"); *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–52, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969) (city requiring permit to conduct a parade); *Freedman v. Maryland,* 380 U.S. 51, 57, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965) (movie censorship system); *Near v. Minnesota,* 283 U.S. 697, 713–17, 51 S.Ct. 625, 630–31, 75 L.Ed. 1357 (1931) (newspaper censorship). Rather, it is one aspect of Chicago's effort to keep within reasonable bounds businesses' usage of the public ways. *See* Chicago Mun.Code § 4–384–060 (establishing discretionary licensing of

sidewalk cafes based on considerations of pedestrian flow, building access, safety and aesthetics). But by targeting for licensing a business inextricably connected to the exercise of First Amendment freedoms, Chicago's scheme raises the possibility of those identifiable risks that we commonly associate with prior restraints.

Firstly, just as the licensure of newsracks can chill a newspaper's zest to pursue issues and opinions displeasing to the licensor, *see City of Lakewood,* 486 U.S. at 757–58, 108 S.Ct. at 2144–45, licensure of newsstands has the potential to prompt vendors to spurn publications offensive to the licensor's (or his constituents') sensibilities and politics. Only a facial challenge adequately addresses such a risk. Secondly, discretionary licensing schemes frequently provide fertile ground for "*post hoc* rationalizations by the licensing official ...", making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.* at 758, 108 S.Ct. at 2145. In an "as applied" challenge, an unsuccessful applicant for a discretionary newsstand permit would face the same kind of struggle in demonstrating that his rejection was motivated by which publications he sells as a disappointed newspaper would in showing it lost its newsrack because of what it writes. The Ordinance sets out what is basically a discretionary system of licensing, the sort of system in which such risks can lurk, and appellants have alleged that under it city officials "enjoy unfettered discretion to deny ... permits altogether." *Ward v. Rock Against Racism,* 491 U.S. 781, 794, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661 (1989). "Thus, waiting for an alleged abuse before considering ... a challenge would achieve nothing except ... to

While this observation may buttress an eventual conclusion that Chicago's mechanism for licensing newsstands passes constitutional muster, to conclude that this single characteristic renders the maintenance of newsstands any less conduct intimately tied to expression is fallacious. The result from such a logical leap and its concomitant hasty dismissal of the constitutional dimensions of this case is a failure to consider the full breadth of First Amendment risks occasioned by discretionary control over newsstands. Admittedly, the licensing of newsstands is a clumsy

way to censor the Chicago Tribune, but it has the potential to be a honed weapon in a war against the lone operator who insists on including controversial or unpopular publications in his selection. Judge Cummings' dissent succeeds in putting its finger on the panoply of hardly fanciful dangers to free expression that can be the bedfellows of the regulation of even mere newsstands. *See post,* at 1337–38. These potential dangers must be acknowledged before turning to address the procedural adequacy of Chicago's licensing system.

risk censorship of free expression during the interim." *Id.* 486 U.S. at 770 n. 11, 108 S.Ct. at 2151 n. 11. Therefore, I feel it is appropriate to examine under the lens of a facial challenge whether the Ordinance is characterized by standards and other features adequate to rein in the exercise of discretion and minimize the risk of content discrimination. *See Freedman,* 380 U.S. at 56–57, 85 S.Ct. at 738 ("Although we have no occasion to decide whether the vice of overbroadness infects the . . . statute, we think that appellant's assertion of a similar danger in the . . . apparatus of censorship—one always fraught with danger and viewed with suspicion—gives him standing to make that challenge.").

## II.

Turning to the details of the Ordinance, none of the six factors upon which the Commissioner of Public Works' permit decisions are based facially vest him with unbridled discretion in accepting and rejecting applicants.[3] Thus, the Ordinance does not grant to city officials the sort of standardless carte blanche that the Supreme Court has unfailingly condemned. *See, e.g., Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). I do recognize that some of the enumerated factors, as well as having a scheme where six are weighed in combination, allow a measure of flex. We must remember, however, that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward,* 491 U.S. at 793, 109 S.Ct. at 2755, and these are after all the kinds of legitimate concerns one would expect a city to weigh when deciding how to allocate limited public space in a neutral way. Moreover, these criteria provide definite and finite guidelines against which the Commissioner's written reasons for a denial, *see* Chicago Mun.Code § 10–28–160(c), can be measured and comparisons made from case to case—a safeguard that the standardless system in *Lakewood* lacked. *See Lakewood,* 486 U.S. at 771, 108 S.Ct. at 2151.

In spite of the presence of these exclusive factors, their residual malleability may still have proven unacceptable had the ordinance been written to apply them to permit renewal and not just the initial decision to issue. The fact that the full range of discretionary criteria does not apply to renewal—renewals are automatic so long as existing newsstands are in compliance with the City Code, *see* Chicago Mun.Code 10–28–160(b)—indicates to me that the Ordinance neither was intended to promote nor in fact dangerously facilitates content discrimination in the licensing of newsstands. One of the distressing features of the newsrack ordinance in *Lakewood* was the need to annually reapply for licenses. This periodic requirement enabled the licensor to routinely discipline newspapers for speech already uttered. *See Lakewood,* 486 U.S. at 759–60, 108 S.Ct. at 2145–46. In the context of newsstands such a system would allow the licensor to monitor the type of publications offered for sale, effectively presenting the more "direct . . . threat to speech [of] allowing a licensor to view the actual content of the speech to be licensed." *Id.* at 760, 108 S.Ct. at 2146. Then, under the cloak of discretionary decision making, the licensor could easily reject a renewal application because he disapproves of what the stand sells. Chicago's *pro forma* renewal process, by contrast, does not afford that kind of opportunity for ongoing censorship.

---

**3.** The Commissioner of Public Works (CPW) in his ultimate decision (as well as the Commissioner of Planning when making his recommendation to the CPW and the City Council, if making a recommendation to the CPW) can only consider:

  (1) whether the design, materials and color scheme of the newspaper stand comport with and enhance the quality and character of the streetscape, including nearby development and existing land uses;

  (2) whether the newspaper stand complies with this Code;

  (3) whether the applicant has previously operated a newspaper stand at that location;

  (4) the extent to which services that would be offered by the newspaper stand are already available in the area;

  (5) the number of daily publications proposed to be sold from the newspaper stand; and

  (6) the size of the stand relative to the number of days the stand will be open and operating.

Chicago Mun.Code § 10–28–160(a).

On application for renewal, the discrete question of compliance with the Code replaces the discretion of the initial permit decision. Furthermore, first time applicants, who are subject to the full discretionary process, do not provide in their application a list of publications that they intend to sell. Therefore, overall, Chicago's mechanism offers few routes by which content motives can obliquely infiltrate the permit process.

### III.

Seemingly the most difficult feature of the Ordinance, in light of Supreme Court precedent, is the absence of any provision for expeditious judicial review of the Commissioner's decision. However, I believe that because the Ordinance does not involve separating protected from unprotected speech and by its own terms presents little risk of facilitating content discrimination, it can survive constitutional attack despite the lack of a self-contained provision for prompt judicial review.

### A.

Since the Supreme Court's decision in *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), it has become accepted practice to examine licensing schemes that regulate speech related activities for the presence of three procedural safeguards: 1) the administrative decision allowing or forbidding the speech must be forthcoming within a short and fixed time; 2) prompt judicial review of a license denial must be available; and 3) the licensor must bear both the burden of going to court and the burden of proof in court. *See id.* at 58–

59, 85 S.Ct. at 738–39. The only possible modification to the *Freedman* requirements may have been anticipated in *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), where three Justices asserted that a city licensing scheme aimed at the operation of sexually oriented businesses need not include the third *Freedman* safeguard.[4] *See id.* 493 U.S. at 229, 110 S.Ct. at 607.

I do not doubt that the Ordinance satisfies the first requirement of rapid and certain administrative action. The Commissioner must make decisions between 35 and 65 days after filing for first time applications and within 10 days for renewal applications. *See* Chicago Mun.Code 10–28–160(c). The longer period is not an unreasonable start-up delay for a new business and can be accounted for by sound planning, and the shorter period both is brief and more importantly, if timely commenced, does not have to interrupt the operation of an existing newsstand. Further, after *FW/PBS*, it seems likely that *Freedman*'s third requirement—that the licensor bear all court-related burdens—does not apply in this case. Chicago's ordinance is not designed to distinguish between protected and unprotected speech, and, like Dallas' ordinance in *FW/PBS*, it sets out a prerequisite to maintaining whole businesses, thus creating strong incentives to challenge adverse decisions. *See supra* note 4.

### B.

While *Freedman*'s first and third requirements are obstacles which the ordinance can clear, the second requirement plainly is not. Simply no provision is made for prompt judicial review. The majority tries to finesse

4. In *FW/PBS*, three Justices (Brennan, Marshall and Blackmun) thought that all three *Freedman* requirements were necessary, *see* 493 U.S. at 239–42, 110 S.Ct. at 612–13 (Brennan, J., concurring in the judgment), while three (O'Connor, Stevens and Kennedy) were content with just the first two, *see id.* 493 U.S. at 227–31, 110 S.Ct. at 606–07 (opinion of O'Connor, J.). To justify dropping the third *Freedman* safeguard, Justice O'Connor distinguished Dallas' ordinance from the licensing systems in *Freedman* and its progeny on two grounds. She observed, first, that under its ordinance Dallas did not purport to "pass[ ] judgment on the content of any protected speech," *id.* 493 U.S. at 231, 110 S.Ct. at 607,

unlike the obscenity censors in *Freedman et al.,* and, second, that because Dallas required a license to operate an adult entertainment business *at all,* "there is every incentive for the applicant to pursue a license denial through the court," *id.* All this is of course dicta since six Justices agreed that the ordinance must fall because the other two *Freedman* requirements did apply and were not satisfied. However, the three who propounded the more narrow reading of *Freedman* are still on the Court as well as one Justice (Rehnquist) who believed *Freedman* did not apply at all. *See id.* 493 U.S. at 243, 110 S.Ct. at 614 (White, J., concurring in part and dissenting in part).

this shortcoming by suggesting that the common law writ of *certiorari* stands as an adequate substitute for an explicit system of swift judicial review set out in the licensing law. Professing confusion about the rationale behind the Supreme Court's insistence on prompt review, the majority glosses over both that there is no indication in the record that Illinois' writ of *certiorari* is any quicker a judicial process than other common law actions and that review of administrative findings of fact is highly deferential in Illinois on *certiorari*. *See Norton v. Nicholson,* 187 Ill.App.3d 1046, 135 Ill.Dec. 485, 491, 543 N.E.2d 1053, 1059 (1989), *appeal denied,* 129 Ill.2d 565, 140 Ill.Dec. 673, 550 N.E.2d 558, *cert. denied,* 496 U.S. 938, 110 S.Ct. 3217, 110 L.Ed.2d 665 (1990). This is clearly not the sort of review *Freedman* envisioned. That Court was explicit about its concerns and holding:

> [B]ecause only a judicial determination in an adversary proceeding assures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid prior restraint.... Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution.... [A]n administrative refusal to license, signifying the censor's view that the film is unprotected, may have a discouraging effect on the exhibitor. Therefore, the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license.

*Freedman,* 380 U.S. at 58–59, 85 S.Ct. at 738–39 (citations omitted). In *FW/PBS,* Justice O'Connor reemphasized that judicial review must be promptly forthcoming "so as to minimize the suppression of the speech in the event of a license denial." *FW/PBS,* 493 U.S. at 229, 110 S.Ct. at 606. This idea that speech delayed is speech denied and the recognition that "the censor's business is to censor," *Freedman,* 380 U.S. at 57, 85 S.Ct. at 738, underlie *Freedman*'s clear demand for a specialized system of prompt judicial review on the merits. And if *Freedman*

were to apply to this case, there can be little doubt that the Ordinance must fall.

However, I believe that a close look at the holding and rationale of *Freedman* shows that it does not apply here of its own force. Moreover, uncritically extending *Freedman's* reach to strike down the Ordinance for lack of judicial review, by attributing broad significance to language in later cases that dealt with schemes substantially dissimilar from the one at issue here, would embark us upon a senseless departure from the core logic undergirding the holdings in *Freedman* and its progeny; for neither the purpose nor effect of the Ordinance, unlike the laws challenged in that line of cases, is to involve the licensor in any decisionmaking of constitutional proportion.

*Freedman* and its immediate offspring involved various administrative attempts to ban obscene materials. Typically, bodies were set up to cull through the contents of expressive materials to decide whether or not to permit dissemination. If an administrative finding of obscenity or the like was made, a license would not issue, and the material could not legally be promulgated in the desired forum. *See Freedman,* 380 U.S. at 521 n. 2, 85 S.Ct. at 736 n. 2 (Board of Censors approving films which are "moral and proper" and disapproving those which are "obscene, or ... tend ... to debase or corrupt moral or incite to crimes"); *Teitel Film Corp. v. Cusack,* 390 U.S. 139, 140, 88 S.Ct. 754, 755, 19 L.Ed.2d 966 (1968) *(per curiam )* (licensing system examining films for obscenity); *Blount v. Rizzi,* 400 U.S. 410, 411–14, 91 S.Ct. 423, 425–27, 27 L.Ed.2d 498 (1971) (postal censorship scheme inspecting mails for obscenity); *United States v. Thirty-seven Photographs,* 402 U.S. 363, 365–66, 91 S.Ct. 1400, 1402–03, 28 L.Ed.2d 822 (1971) (custom agents confiscating imported obscene materials); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 548, 95 S.Ct. 1239, 1241, 43 L.Ed.2d 448 (municipal theater directors rejecting performance of "Hair" believing show was obscene and thus not "in the best interest of the community"); *cf. Vance v. Universal Amusement Co.,* 445 U.S. 308, 316 & n. 14, 100 S.Ct. 1156, 1161 & n. 14 (1980) *(per curiam )* (state law authorizing

state judges to enter temporary restraining orders and injunctions of indefinite duration against motion pictures without a final adjudication of obscenity).

Several themes emerged from the post-*Freedman* cases with regard to the necessity for procedural safeguards. The first, initially dominant theme permeated *Freedman* itself. There the Court's concerns focused on the institutional tendency of censorship boards to overcensor. "Because the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression." *Freedman,* 380 U.S. at 57–58, 85 S.Ct. at 738–39. Prompt judicial review and other procedural requirements were required to ameliorate the unacceptable risk of undue suppression of speech. *See id.* at 58, 85 S.Ct. at 738.[5] This distrust of anything short of a full-blown judicial determination of the protected character of speech carried through the cases that followed[6] and together with the general distaste for unnecessary delay of speech underlaid the continuing insistence on prompt judicial review.

A second, and somewhat different, theme can be gleaned from the two most recent cases invoking *Freedman.* These cases did not involve licensing laws under which administrative officials were overtly charged with making decisions of constitutional dimension. In *Riley v. National Federation of the Blind of North Carolina,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), the Supreme Court examined a Maryland requirement that professional fundraisers be licensed before conducting charitable solicitations. The law did not purport to pass judgment on the expressive content of anticipated solicitation, but neither did it set a time limit within which the licensor was required to decide upon permit requests. *See id.* at 802, 108 S.Ct. at 2680. Because of the possibility of indefinite delay, nothing "effectively constrain[ed] the licensor's discretion," and the statute was struck down for lack of procedural safeguards. *Id. FW/PBS* also involved an administrative provision requiring that those who wished to engage in a particular line of business—in this case maintaining adult entertainment establishments—procure a special license. Here too "[the] regulatory scheme allow[ed] indefinite postponement of the issuance of a license." *FW/PBS,* 493 U.S. at 227, 110 S.Ct. at 606. Expanding on what was intimated by the *Riley* Court, Justice O'Connor's opinion[7] pointed out that granting a licensor unlimited time to issue a license and vesting him with broad discretion in making the decision to issue are really two sides of the same coin: "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion." *Id.* at 227, 110 S.Ct. at 605.

The common danger posed by licensors not anchored by either standards or time constraints is the opportunity for the content based suppression of speech. *See Lakewood,* 486 U.S. at 763–64, 108 S.Ct. at 2147–48. By manipulating loose standards or by delaying action, a licensor can suppress speech of which he disapproves. This grave risk, *see R.A.V. v. City of St. Paul,* —— U.S. ——, ———–——, 112 S.Ct. 2538, 2543–44, 120 L.Ed.2d 305 (1992), was presented by the non-time restricted processes in both *Riley* and *FW/PBS* and could be adequately abated

---

**5.** Note that the basic problem in *Freedman* was not unbridled discretion in administrative hands, but the inadequacy of administrative processes in general to demarcate the correct line between protected and unprotected speech. The Court did recognize, however, that these two very different shortcomings present a common danger: the risk of oversuppression of speech. *See id.* 380 U.S. at 57, 85 S.Ct. at 738.

**6.** In *Southeastern Promotions,* the Court acknowledged that independent of an administrative board's ability to correctly categorize speech, it is always necessary that what the administrative body purports to decide constitutes a constitutionally permissible basis for preventing speech. *See Southeastern Promotions,* 420 U.S. at 558, 95 S.Ct. at 1246. But because the Court found inadequate procedural safeguards in the case, it did not reach the issue of whether as a substantive matter a production can be kept off a public stage because it is not deemed "culturally uplifting or healthful." *Id.* at 558, 561, 95 S.Ct. at 1246, 1247.

**7.** She was writing for three Justices. *See supra* note 4.

only by the availability of prompt judicial review.

I believe that these cases indicate that the judgments we wisely do not trust to administrative officials without the benefit of a watchful judicial eye are those judgments that are made or are likely to be made in the First Amendment plane. *Cf. Chicago Teachers Union v. Hudson,* 475 U.S. 292, 309, 106 S.Ct. at 1077 (1986) (reasoning that *because* "the agency shop itself impinges on the non-union employees' First Amendment interests," a "reasonably prompt decision by an impartial decisionmaker" as to the appropriateness of mandatory contributions to a collective bargaining agent is necessary). Determinations of what is protected speech and determinations likely to be made according to one person's view of what is favored speech involve those sorts of judgments. As a corollary, then, schemes that abjure such judgments—unlike those in *Riley* and *FW/PBS*—should not be required to include a *Freedman* system of judicial review. *Cf. Hudson,* 475 U.S. at 307 n. 20, 106 S.Ct. at 1076 n. 20 (suggesting that *Freedman* procedures are not necessary in all situations involving First Amendment materials). Clearly included among such nonthreatening schemes are those that only ask *and* allow administrators to make the kind of determinations for which they are especially suited; *e.g.* questions about city aesthetics, traffic flow or City Code violations.

Certainly, the Ordinance is in that category of innocuous schemes which a specially mandated judicial review mechanism would only hamper through inappropriate and inefficient second-guessing of legitimate administrative decisions. As discussed, the Ordinance contains definite and reasonable time constraints as well as standards and a structure which effectively foreclose any serious opportunity for content based decisionmaking. It does not put before the licensor the authority, information or mechanism by which he could make decisions of direct First Amendment concern. Consequently, the Ordinance does not implicate the kinds of risks which should necessitate a special provision for judicial review.

## IV.

Furthermore, I agree with the majority's conclusion that the place and manner restrictions that the Ordinance imposes on licensed newsstands fall within the limits of constitutional acceptability. For all of the foregoing reasons, I believe that the Ordinance survives facial attack and should be upheld. I therefore concur in the judgment.

RIPPLE, Circuit Judge, with whom CUDAHY and ILANA DIAMOND ROVNER, Circuit Judges, join concurring.

The significant number of opinions already filed in this case would, under most circumstances, be a substantial disincentive to another contribution by a single member of the court. The eyes of the bench and bar, and certainly those of the Justices of the Supreme Court of the United States who will undoubtedly be asked to review our work, are a fragile national resource. Under the unique circumstances presented here, however, an addition to the dialogue is justified because this case presents a most difficult problem for the court, a problem that, in the final analysis, can only be resolved by additional guidance from the Supreme Court of the United States. Under such circumstances, we have an obligation to examine thoroughly the matter while it is before us.

We must frankly admit the source of our difficulty. The opinions of the Supreme Court in *FW/PBS v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), and *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), applied literally, appear to provide an analytical framework for the problem before us. My dissenting colleagues have filed a thorough exposition of this approach and, if the Supreme Court intends that *FW/PBS* and *Lakewood* be read and applied in such a formal fashion, this opinion has much to recommend it. By contrast, the principal opinion apparently finds the approach of these cases to produce an unrealistic result and seeks to avoid their application by recharacterizing the situation presented by this case as devoid of any expressive activity. In order to accomplish this feat, the principal opinion must declare that the place-

ment of a newsstand, as opposed to a news-rack, does not implicate expressive activity. I respectfully submit that this approach is untenable. In *Lakewood,* the Supreme Court expressly noted that the regulatory scheme at issue in that case involved "expression or conduct commonly associated with expression: the circulation of newspapers." 486 U.S. at 760, 108 S.Ct. at 2145. This case also involves the circulation of newspapers. The fact that one case involved a small, mechanical stand and the other a larger, manned stand cannot alter the reality that both involve expression. Indeed, the awkwardness of the plurality's attempt at a quick fix to this difficult problem is readily apparent in the opinion's subsequent reliance, despite its declaration that the First Amendment is not implicated, on a traditional First Amendment analysis—time, place, and manner regulation—to resolve ultimately the merits of the case.

In my view, we must frankly face up to the difficulty before us. This case *does* involve a First Amendment interest. Like Judge Flaum, I believe that, if *FW/PBS* and *Lakewood* do not govern our decision, we must be able to discern a principled doctrinal distinction between them and the case before us. A useful key to unlocking this analytical conundrum is, I believe, the established analysis applicable to time, place, or manner restrictions. For a very long time the Supreme Court has had to deal with even-handed attempts to regulate the exercise of expression in public forums. Parade or demonstration permits are the usual context in which these cases have arisen. The Court has evaluated such attempts by governments to bring order to the public forum under what is commonly known as time, place, or manner analysis.

*See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The Court has "often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternate channels for communication of the information." *Id.* at 293, 104 S.Ct. at 3069; *see also Cox v. New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941) ("If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place, and manner in relation to the other purposes of the streets.").[1]

If we are to apply this approach to the situation before us, we must deal frankly with *FW/PBS* and *Lakewood* which, our dissenting colleagues remind us, appear to have an easy application to this case. These two cases appear to apply prior restraint analysis to fact situations that are the functional equivalent of those situations that the Court had analyzed traditionally under the time, place, and manner analysis. Specifically, in *Lakewood,* the Court struck down as facially invalid an ordinance requiring a license to place newspaper dispensing machines on the city streets. Similarly, in *FW/PBS,* the Court struck down parts of an ordinance requiring the licensing of adult businesses. In both cases, the Court characterized the restriction imposed by the ordinance as a prior restraint and determined that its failure to comply with the stringent mandate of *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct.

---

**1.** The Court also has used time, place, and manner analysis to evaluate restrictions on expression outside the parade and demonstration context. *See, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (upholding noise ordinance under *Clark* time, place, and manner formulation); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (stating that zoning ordinance limiting placement of adult theatres was content neutral and valid as a time, place, manner regulation); *Heffron v. International Soc'y for Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)

(holding state fair rule that required all distribution and sale of materials to take place from fixed location was reasonable time, place, and manner restriction); *Virginia Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (acknowledging time, place, manner analysis for restrictions "that are justified without reference to the content of speech, that ... serve a significant governmental interest, and that ... leave open ample alternative channels for communication of the information," but holding test inapplicable to ban on advertisement of prescription drug prices which made reference to content).

734, 13 L.Ed.2d 649 (1965), rendered the ordinance unconstitutional.

We must determine why, in *Lakewood* and *FW/PBS*, the Court did not follow its usual approach of treating factual situations such as these as susceptible to time, place, and manner analysis and instead employed prior restraint analysis. What distinguishes the Court's treatment of licensing schemes in these two sets of cases is the presence of unfettered discretion. In both *Cox* and *Clark*, the Court dealt with the administration of an ordinance or regulation which proscribed the activity of the licensing authority. In fact, the *Cox* Court distinguished those cases in which government officials were unrestrained in their power to grant or deny permits. 312 U.S. at 577, 61 S.Ct. at 766. In both *Lakewood* and *FW/PBS*, however, there was unfettered discretion to grant or deny the license—in *Lakewood* pursuant to the very language of the ordinance and in *FW/PBS* pursuant to the way the licensing official could delay the licensing decision, presumably indefinitely. This type of discretion, in the Court's eyes, "gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood,* 486 U.S. at 759, 108 S.Ct. at 2145. It also presents the possibility of selfcensorship. *Id.* Because of these concerns, the Court in *Lakewood* struck down the ordinance absent "neutral criteria to insure that the licensing decision is not based on the content," *id.* at 760, 108 S.Ct. at 2146, and, in *FW/PBS*, struck down the ordinance absent the procedural guarantees of *Freedman,* 493 U.S. at 228, 110 S.Ct. at 606.

The concerns the Court voiced in both *Lakewood* and *FW/PBS* are not present here. The Chicago ordinance sets forth criteria according to which a permit must be evaluated. Furthermore, there is a time limit within which city officials must respond to the application. In no way does the ordinance place unfettered discretion in the hands of city officials. As a result, there is no risk of either hidden or self censorship.[2] It is the absence of this discretion, and the risks inherent in it, which allows us to evaluate the ordinance according to the guidelines of *Cox, Clark,* and, as the plurality mentions, *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

I therefore respectfully submit that time, place, and manner analysis is an appropriate analytical tool for the assessment of this statute and, like my colleagues who have joined the principal opinion, I believe that the ordinance in question can be sustained on this basis. I hasten to add, however, that there is a great need for clarification of standards in this area, and I respectfully suggest that this case is deserving of further review in the Supreme Court of the United States. City officials ought to be able to address matters as basic as the regulation of newsstands on the city streets in a more expeditious manner than afforded by litigation of this sort.

CUMMINGS, Circuit Judge, with whom BAUER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge, join, dissenting.

I agree with the majority that no person has an inherent or fundamental right under the Constitution to build a structure on public property, but my agreement with Judge Manion's opinion ends there. The issue is not whether a municipality may regulate speech taking place on a public sidewalk—of course it may—but what the city must demonstrate to justify the regulation. *Hague v. CIO,* 307 U.S. 496, 515–516, 59 S.Ct. 954,

---

**2.** *Lakewood* hints at this distinction. In excepting building permits from the scope of its holding, it noted that its holding did not apply to "laws of general application that are not aimed at conduct commonly associated with expression." *Lakewood,* 486 U.S. at 760–61, 108 S.Ct. at 2145–46. It noted that, although such laws of general application are subject to abuse, the abuse easily can be detected because "the general application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Id.* at 761, 108 S.Ct. at 2146. Here, we do not deal with laws of general applicability. As demonstrated in the text, however, we do deal with a statute whose structure and operation render content-based abuse at the hand of governmental officials detectable in a relatively easy manner.

963–64. I respectfully dissent because the majority's decision is at odds with two recent Supreme Court decisions: *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771, and *FW/PBS v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603. In each case, the Court struck down municipal licensing schemes that regulated some form of speech—in *Lakewood* newsracks, and in *FW/PBS* sexually oriented businesses—because the ordinances placed too much power in the hands of a city official. The Court feared that the city official might abuse his authority by discriminating against the speaker based on the content of his speech. In the present case, Chicago also seeks to license First Amendment activity and in so doing has vested a city administrator with the power of content discrimination.

By upholding the Chicago ordinance, the majority ignores or contradicts *Lakewood* and *FW/PBS* in at least three respects. First, Judge Manion contends that Chicago's newsstand ordinance does not implicate the First Amendment at all because it merely regulates conduct, not speech. This is insupportable. *Lakewood* struck down a regulation of newsracks as a prior restraint under the First Amendment, and newsracks and newsstands are as close an analogy as one is likely to find. Not even the majority seems persuaded by this view of the First Amendment, since the opinion goes on to analyze Richard Graff's challenge in constitutional terms. Second, *Lakewood, FW/PBS* and a long series of earlier decisions review licensing schemes directed at First Amendment activity as prior restraints on speech that are valid only if the licensor's power is checked by procedural safeguards. The majority, however, frames Chicago's ordinance as merely a time, place and manner regulation, not a prior restraint, and subjects it to only the most deferential scrutiny. Third, *FW/PBS* requires an ordinance like Chicago's to provide for prompt judicial review of the decision to deny a license—and *FW/PBS* shows that common law certiorari cannot meet this requirement. Yet the majority upholds Chicago's newsstand ordinance (which is silent on the subject of judicial review) on the ground that common law certiorari is available. Today's decision can only sow confusion in First Amendment jurisprudence and weaken the protections it affords for newsstand operators and others as well.

Because *Lakewood* held that erecting newsracks on public property is speech protected under the First Amendment, the majority must explain how newsstands differ from newsracks if it is to hold that the former do not constitute speech. According to the opinion, "newsstands compared to newsracks are much larger, more permanent structures that occupy a significant portion of limited sidewalk space. Thus, building and operating a newsstand is conduct, not speech * * *" (Opinion at p. 1315). The argument, in essence, is that newsstands receive less First Amendment protection than newsracks because they hold more opinions and are bigger. With all due respect, these distinctions cannot remove newsstands from the First Amendment. It is true that the size of newsstands might make them a more inviting subject of municipal regulation, although one large newsstand produces less clutter than several newsracks chained to various street lamps. Yet size itself suggests nothing about whether the selling of newspapers and magazines from a stand is speech or conduct. And since the First Amendment is all about seeing to it that citizens have access to a wide variety of opinions and information, the fact that stands offer more opinions than racks would suggest that they should receive greater, not lesser protection. Cf. *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (Brandeis, J., concurring); *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013; *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686. Newsracks might be a more convenient target for content discrimination because they sell discrete products, but this fact is also irrelevant in the initial judgment about whether the operation of a newsstand is conduct or speech.

In truth, it is both. Cf. *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342; *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284; *Tinker v. Des Moines School District,* 393 U.S. 503, 89

S.Ct. 733, 21 ·L.Ed.2d 731. As the majority points out, erecting a structure on a sidewalk is a physical act. But Graff did not seek a permit merely to build a stand on the public pavement; he also wanted permission to show up every morning and hawk his newspapers and magazines from its confines, just like the publisher in *Lakewood* who used newsracks to sell papers. There is of course no inherent First Amendment value in the mundane activity of placing metal boxes on street corners. Nevertheless, the boxes in *Lakewood* received constitutional protection because they made the distribution of First Amendment material easier. Here the city argues that Graff can sell his papers and magazines from the sidewalk without the stand, but this misses the point. The stand is an implement of commerce that facilitates the vendor's free speech. Graff's newsstand gives him greater visibility, a stable location, and the ability to sell a wide variety of publications. The publishers in *Lakewood* could also have sold their papers without newsracks by simply leaving piles of papers on street corners under rocks—with honest purchasers depositing their quarters in small cups. But the Supreme Court has long recognized that the First Amendment protects the expression of ideas as well as ideas themselves, and that distribution is an inseparable part of expression. See, *e.g., Smith v. California*, 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205. To hold otherwise would be to elevate form over substance; one might as well say that publishing a newspaper is purely conduct because, after all, putting ink to paper is a physical act. Moreover, the speech the city seeks to regulate here takes place on a traditional public forum: the sidewalk. *Hague,* 307 U.S. at 515–516, 59 S.Ct. at 963–64. I do not suggest that all regulation is inappropriate. But to pretend that the First Amendment does not come into play at all is mistaken. As Justice Roberts said in *Hague,* the right of citizens to use the sidewalk for speech "is not absolute, but relative * * *. But it must not, in the guise of regulation, be abridged or denied." *Id.*

A second fallacy underlies the majority's discussion. It is that newsstand operators such as Graff do not need the protections of the First Amendment because the potential for abuse is small. The majority suggests both that Chicago lacks the means and will to discriminate on the basis of content, and that newsstands, since they are not associated with one particular publication, are not likely targets of such discrimination. This reasoning is undoubtedly behind the majority's failure to recognize that licensing of newsstand operators constitutes a prior restraint. But newsstand operators do have a point of view based on the publications they choose to peddle. Their decisions to sell or not sell pornography, religious literature and political publications are matters of judgment, advocacy and editorial discretion, like booksellers. *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098; *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; *Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205. Recall that Graff's suit like *FW/PBS* and *Lakewood* is a facial challenge; thus the harm is necessarily theoretical. As the majority correctly points out, it is unlikely that the mayor in a pique over an unfavorable editorial would order municipal employees to revoke the license of every newsstand selling the *Chicago Tribune* (*i.e.,* every newsstand in the city). But it is hardly a stretch to imagine city officials using the threat, of license renewal to combat the prevalence of pornographic but perfectly legal magazines on the · sidewalks. Nor is it difficult to imagine officials, angry over articles in one of the many smaller, less visible weekly publications sold in Chicago, threatening newsstand operators who refuse to drop the offending organ. The majority suggests that even if every newsstand were closed, the *Chicago Tribune* would have other methods of distribution including newsboys, newsracks and in-building newsstands. This is true enough for the *Chicago Tribune,* but not so for the hundreds of other, smaller, off-beat publications that are available only at newsstands. To these publications, newsstands—where the marginal cost of carrying an additional paper or magazine is low—represent the only access to the marketplace; after all, not every publisher can afford to blanket the city with newsracks or persuade bookstores paying premium rents to sell its product.

Moreover, contrary to the majority's assertions, the ordinance at issue does leave room for city officials to punish newsstands based on content. Though at first blush the statute offers elaborate procedural guidelines for the issuance and denial of permits, these are illusory. For example, Section 10–28–160(a) outlines procedures for hearings and reports by which a City Council committee is to comment on a proposed newsstand license. But these procedures are entirely optional. Under the ordinance the City Council could decide not to comment on newsstand applications at all. In addition, in each case not involving an historical landmark, the Commissioner of Public Works is the sole, unfettered decisionmaker. It is a measure of the leniency of the city's criteria that Graff's application was ultimately denied even though his stand has operated at the same site for approximately seventy years; the ordinance instructs the Commissioner to consider a stand's longevity before granting or denying a permit, but this did not help Graff. Perhaps the most glaring deficiency in the ordinance, however, is the lone reference to subsequent review of the Commissioner's decision. Under Section 10–28–160(c), a vendor whose application is denied has ten days to request a hearing "at which he will be given an opportunity to prove that the determination of the Commissioner was in error." The ordinance does not define error or specify what proof is required. And the person who reviews the decision by the Commissioner of Public Works is none other than the Commissioner of Public Works! The ordinance merely instructs the Commissioner to issue a permit promptly if he "determines that his previous determination was incorrect." Chicago Mun.Code § 10–28–160(c). Given the lack of genuine means for appeal, judicial or otherwise, and the purely optional nature of these procedures, the city's standards are mere window-dressing rather than a practical check on the power of the administrator.

The city contends that any attempt at content discrimination would fail because permit applications do not contain a list of what publications a particular newsstand sells. This is hardly comforting. City officials, were they so inclined, could stroll over to a stand and examine for themselves what magazines are sold. The ordinance also contains no minimum or maximum limit on the number of permits issued. Thus were the Commissioner seeking to punish a stand for selling a specific publication, he would not face the obstacle of having to find a replacement vendor. Officials also are expressly instructed under the ordinance to give preference to stands selling the most daily newspapers. The majority characterizes this provision as "an obvious attempt at variety, not indoctrination" (Opinion at p. 1321). But why does Chicago feel compelled to state a preference when the marketplace itself will prompt newsstand operators to carry more dailies if, as the majority maintains, they reach the most number of people? This looks like an attempt by officials to curry favor with the most powerful press in the city.

Each of these deficiencies is aggravated by the silence of the ordinance on the subject of judicial review. Here is where the Chicago regulation runs smack into a constitutional wall. The majority tries to steer around the wall by holding that the ordinance is not a prior restraint and subject to merely time, place and manner analysis. The majority's view ensues from its treatment of the Chicago regulation as a zoning ordinance rather than a licensing scheme. Thus the majority analogizes Graff's challenge to *City of Renton v. Playtime Theatres*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29. In that case the Court upheld a municipal ordinance prohibiting adult theaters from setting up shop close to a house, church, park or school. The Court applied a time, place and manner analysis—that is, the justices asked only whether the ordinance was designed to serve a substantial governmental interest and whether it allowed for reasonable alternative avenues of communication. *Id.* at 50, 106 S.Ct. at 930. But the ordinance in *City of Renton* was a zoning restriction—that is, it established rules that applied across the board to all similarly situated enterprises. There was no threat in *City of Renton*, then, that a decisionmaker would discriminate against individual merchants based on the content of what they sold. Under a licensing scheme, by contrast, a city official is vested with the power to make decisions regarding individual

permit applicants. The Chicago ordinance—where an official grants or denies individual permit applications and then reviews the permits periodically—is analogous not to the ordinance in *City of Renton* but to the ordinances in *FW/PBS* and *Lakewood.*

Chicago's licensing scheme represents a classic prior restraint because it forces news vendors to apply for a permit from local officials before they can sell newspapers and magazines; the city itself assumes the power to regulate speech and puts the authority of denial in the hands of one official. As the Court said in *Lakewood,* "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." 486 U.S. at 759, 108 S.Ct. at 2145. There the Court recognized two critical factors—both present in this case as well—that identified a licensing scheme subject to facial challenge. First, businesses had to apply for licenses that were periodically renewed by the issuer. Second, the licensing system was "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." *Id.* at 760, 108 S.Ct. at 2145. The Chicago ordinance is also directed specifically at newsstand operators: "It shall be unlawful for any person to erect, locate, construct or maintain any newspaper stand * * * without obtaining a permit * * *." Chicago Mun. Code § 10–28–130.

A licensing scheme that operates as a prior restraint, as opposed to a zoning ordinance, is subject to more intense scrutiny than mere time, place and manner analysis; the regulation must also provide adequate procedural safeguards to prevent city officials from abusing their discretion. The Supreme Court has held in a long line of cases that authority exercised to administer a licensing scheme must be bounded by clear and precise standards where officials have the power to foreclose speech in public places. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448; *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–151, 89 S.Ct. 935, 938–39;

*Staub v. City of Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302; *Kunz v. New York,* 340 U.S. 290, 293–294, 71 S.Ct. 312, 314–15, 95 L.Ed. 280; *Schneider v. State,* 308 U.S. 147, 161–162, 60 S.Ct. 146, 149–51, 84 L.Ed. 155; *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954. A prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649. An ordinance must contain explicit limits on the decisionmaker's discretion. *Lakewood,* 486 U.S. at 769, 108 S.Ct. at 2150. It is also clear that these limits must exist whether or not a municipal ordinance also happens to pass muster as a time, place and manner restriction. In *FW/PBS,* for example, the plurality did not even reach the time, place and manner question because the procedural safeguards in that ordinance were inadequate. 493 U.S. at 223, 110 S.Ct. at 603.

It is thus both surprising and dismaying that the Court's decision today focuses so heavily on the merits of the Chicago ordinance as a time, place and manner restriction, to the exclusion of its other failings. Given the lack of sufficient procedural safeguards, the majority's discussion of time, place and manner is interesting, but beside the point. Under *FW/PBS,* which by the way follows from a long line of cases setting forth similar standards, a city may only license a business associated with First Amendment freedoms if, first, the licensor is obligated to grant or deny the permit within a specified and reasonable time during which the status quo is maintained and, second, if there is the possibility of prompt judicial review in the event the license is erroneously denied. *Id.* at 228, 110 S.Ct. at 606. A ministerial action denying a license is not presumptively invalid, unlike most prior restraints, and the city is not required to justify its decision in court on every occasion. *Id.* at 229, 110 S.Ct. at 607. However, the vendor denied a license must be able to seek prompt judicial review, and the absence of review is fatal. See *Southeastern Promotions,* 420 U.S. at 561–562, 95 S.Ct. at 1247–48; *FW/PBS,* 493 U.S. at 229, 110 S.Ct.

at 606;[1] *Freedman,* 380 U.S. at 58, 85 S.Ct. at 738; cf. *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 442–443, 77 S.Ct. 1325, 1328–29, 1 L.Ed.2d 1469.

Even the majority admits that in *Freedman* the Supreme Court has "set out the apparent requirement that an ordinance such as this explicitly provide for prompt judicial review" (Opinion at p. 1324). Since the Chicago ordinance makes no mention of prompt judicial review, and indeed provides no mechanism for it, it must be invalid. According to the majority, however, "it is not clear" why the *Freedman* Court chose to require that licensing schemes make explicit provision for prompt judicial review when common law certiorari is available (Opinion at p. 1324). The majority uses its confusion as an excuse simply to ignore the requirement by stating that the availability of common law certiorari is an adequate form of judicial review when an ordinance is otherwise silent. The majority's conclusion is in direct conflict with *FW/PBS,* 493 U.S. at 229, 110 S.Ct. at 606. In that case, the Supreme Court held that a municipal ordinance—where of course appeal by common law certiorari was also available—was invalid in part because it "fail[ed] to provide an avenue for prompt judicial review so as to minimize suppression of the speech in the event of a license denial. We therefore hold that the failure to provide these essential safeguards renders the ordinance's licensing requirement unconstitutional insofar as it is enforced against those businesses engaged in First Amendment activity * * *." 493 U.S. at 229, 110 S.Ct. at 606. In fact, the ordinance struck down in *FW/PBS* for want of judicial review had a more elaborate appeals procedure than Chicago's newsstand ordinance, including the right to take one's case to a permit and license appeal board and to an automatic stay during those proceedings.[2] Clearly, if the ever-present availability of common law certiorari was unable to cure the ordinance in Dallas, it cannot save the Chicago ordinance

either. The majority's holding to the contrary puts this Circuit at odds with an explicit and oft-repeated mandate from the Supreme Court.

Common law certiorari is insufficient because it is much too slow and uncertain as a mechanism for safeguarding speech. It is an unfortunate fact of life in the modern court system that it may take years, and cost a plaintiff a great deal of money, before his complaint receives a hearing on the merits. Contrast that with the traditional vigilance First Amendment jurisprudence has shown toward prior restraints on speech:

> Any system of prior restraint * * * "comes to this Court bearing a heavy presumption against its constitutional validity." * * * The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Vance v. Universal Amusement Co., Inc.,* 445 U.S. 308, 316 n. 13, 100 S.Ct. 1156, 1161 n. 13, 63 L.Ed.2d 413 (citations omitted). To force a purveyor of First Amendment materials whose speech has been stifled to wait months, if not years, for a court to pass judgment on his case is anathema to prior restraint law. See *Kingsley Books,* 354 U.S. at 438–443, 77 S.Ct. at 1326–29 (upholding procedural safeguards where statute required obscenity hearing within one day of charge, and judicial decision within two days of hearing). Moreover, under common law certiorari the government is as a general rule

---

1. The majority suggests that reliance on *FW/PBS* is misplaced because part of Justice O'Connor's opinion was joined by only two other justices. But three other justices concurred in the judgment and criticized Justice O'Connor's position because the procedural safeguards she prescribed were not strong enough!

2. The Dallas ordinance is reprinted as an appendix to the district court's decision in *FW/PBS. Dumas v. City of Dallas,* 648 F.Supp. 1061, 1084–1085 (N.D.Tex.1986).

not enjoined from prohibiting speech while the case is being appealed. Chicago profits by delay while the speaker and audience suffer.

The majority posits the curious argument that Illinois law prevents municipalities from specifying what form of judicial review an administrative decision must receive. Perhaps. But since when does a city gain special dispensation to violate the United States Constitution because a state law contradicts it? Under the Supremacy clause, the state law must give. Nor is it clear that Illinois law does prevent Chicago from specifying a form of prompt judicial review. The cases cited by the majority, *Nowicki v. Evanston Fair Housing Review Board,* 62 Ill.2d 11, 338 N.E.2d 186 (1975), and *Quinlan & Tyson, Inc. v. City of Evanston,* 25 Ill.App.3d 879, 324 N.E.2d 65 (1st Dist.1975), stand mainly for the proposition that Illinois cities lack the power to alter the jurisdiction of state circuit courts. This would not prevent the municipality from specifying an expedited procedure, or petitioning the state legislature for a minor change in the law, or even setting up an administrative review procedure at least to blunt the unfairness of having the Commissioner of Public Works act as the primary reviewer of his own decisions.

The majority's approach to Graff's challenge is confusing indeed. After today's decision, it is unclear who may bring facial challenges, whether licensing schemes directed at First Amendment activity are to be analyzed as prior restraints, whether a licensing restriction aimed purportedly only at the time, place and manner of speech must include procedural safeguards, and whether those safeguards must encompass prompt judicial review. Indeed, it is not even clear after today's decision whether selling newspapers from anything other than a corner box implicates the First Amendment. While regulation of the typical modern newsstand, with its shabby mix of magazines specializing in pornography, tattoos and motorcycles, may not arouse passionate concern about the denial of free speech, newsstands remain an important sector of the newspaper industry, particularly in a big-city market such as Chicago. See amici curiae of *Chicago Tribune, Chicago Sun–Times* and Gannett Satellite Information Network, Inc., publisher of *USA Today.* The city's regulation thus strikes at the core of the First Amendment. I would hold that Chicago may regulate newsstands,[3] but that its burden must be higher than what the Court requires today—a burden that the Chicago ordinance in its present form cannot meet because of the absence of judicial review. Because of the confusion that will inevitably flow from the majority decision, I respectfully dissent.

---

3. The newsstand in question harmonizes with the appearance of the adjacent former Chicago Public Library, is set unobtrusively at the edge of one side of the building, does not interfere with its maintenance and does not block the sidewalk.